[No. 56619-4.   En Banc.   September 19, 1991.]

WORLD WIDE VIDEO, INC., *Appellant,* v. THE CITY OF TUKWILA, *Respondent.*

*Gilbert H. Levy,* for appellant.

*LeSourd & Patten, P.S.,* and *Michael R. Kenyon,* for respondent.

DOLLIVER, J. — An adult bookstore sued the City of Tukwila, alleging the City's new adult entertainment zoning ordinance unduly restricted free speech. At trial, the zoning ordinance was declared unconstitutional, while the City's peep show licensing ordinance was upheld against the same challenge. Both parties appealed and direct review was granted. We affirm the trial court on both issues.

I

Since late 1987, World Wide Video, Inc. (WWV) has operated an adult entertainment establishment in the City of Tukwila (Tukwila). In addition to selling and renting sexually explicit magazines, novelties, and videotapes, WWV has eight panoram, or peep show, booths on the

premises. WWV is located in a commercial zone and directly abuts a residential zone.

A few months after WWV began operations in Tukwila, the City began a review of its existing adult entertainment legislation. Various materials were considered in the course of the review, including but not limited to Tukwila's existing adult motion picture ordinance, adult use studies prepared by the Cities of Des Moines and Kent, materials prepared by an antipornography group, certain applicable United States Supreme Court and Washington Supreme Court cases, and information provided by an assistant police chief of the City of Renton. The results of the review led to the consideration and adoption, in June 1988, of Tukwila Ordinance 1465 (amending Tukwila Municipal Code (TMC) 18.06.825).

Ordinance 1465 regulates adult motion picture theaters, adult bookstores, adult video stores, adult retail stores, and other adult uses. Such adult uses are permitted in Tukwila only within the M-2 heavy industrial zone. Within the M-2 zone, adult entertainment establishments must meet various dispersion requirements. The trial court found similar combination concentration/dispersion zoning plans have been utilized in other communities in Washington.

Tukwila Ordinance 1475 (TMC 5.52), passed later in 1988, regulates panorams, or peep shows. It includes provisions requiring an applicant to acquire a panoram premises license ($100 annual license fee), panoram device licenses for each peep show on the premises ($50 annual license fee), and a panoram operator's license for each operator ($725 annual license fee). Applicants for such licenses must provide certain information, including "[t]he name, address and telephone number of each person holding an ownership, leasehold or [some sections include the word "other"] interest in the panoram [premises or device]". *See* TMC 5.52.060(b)(1)(B), (2)(B), (3)(B). The city clerk is required to issue the licenses, or the reasons for nonissuance, within 30 days after the date

of filing any application. The 30-day period is intended to provide time for various necessary investigations by the police department, health department, etc.

In addition to the foregoing, ordinance 1475 includes various requirements regarding the configuration of peep show booths: Doors must be cut at least 42 inches from the floor; there may be no openings in the partitions between booths except close to the floor and the ceiling; the booths must not be locked; lighting must be equal throughout the premises; and booths must not have any seating surface if they have a door or curtain. WWV does not comply with any of these requirements.

Tukwila does not deny the speech engaged in by WWV is protected under the first amendment to the United States Constitution and under article 1, section 5 of the Washington Constitution. Both the zoning ordinance and the panoram ordinance thus affect protected speech. WWV brought suit in superior court challenging the constitutionality of the new adult entertainment zoning ordinance, and seeking injunctive and declaratory relief. WWV alleged free speech, due process and equal protection violations under the United States Constitution and article 1, section 5 of the Washington Constitution. Tukwila answered and counterclaimed, seeking injunctive relief based on WWV's noncompliance with Tukwila's panoram licensing ordinance. WWV answered the counterclaim by alleging that the panoram ordinance was also constitutionally defective. The hearing on the motions was consolidated with trial on the merits, and the case was tried to the court. The trial court found in favor of WWV on the constitutionality of the zoning ordinance and in favor of Tukwila on the panoram licensing ordinance. Both parties appealed.

## II

■ Each party assigns error to several of the trial court's findings of fact.

In Washington, findings of fact supported by substantial evidence will not be disturbed on appeal. Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.

(Citations omitted.) *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987). We believe the trial court did an excellent job of making specific, well-supported findings of fact. The only finding of fact we find not to be supported by substantial evidence is finding of fact 45:

The City Police Department would require approximately two full days to investigate each . . . additional operator's license.

Because most of the information required in connection with the operator's license is based on the business rather than on the individual operator, investigations of *additional* operator's licenses would likely take far less than 2 days each. We agree with plaintiff there is neither testimony nor reasonable inference from the testimony to support finding of fact 45. Our rejection of this finding of fact, however, has no impact on the outcome of the case.

### III

■ Although article 1, section 5 provides greater protection for speech rights than does the United States Constitution, *O'Day v. King Cy.*, 109 Wn.2d 796, 802, 749 P.2d 142 (1988), federal law operates as a floor for speech protection, above which article 1, section 5 operates only when appropriate. When we believe a statute to be clearly in violation of the United States Constitution, as we do here with regard to ordinance 1465, the zoning statute, it is unnecessary to enunciate a state rule and we do not do so. We look, therefore, to federal law to determine the minimum limits of protection in this area, while emphasizing that our application of the federal standard does not constitute its adoption as the Washington standard.

■ In 1986, the United States Supreme Court ruled on a Renton ordinance that regulated the location of adult

motion picture theaters. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986). *Renton*'s status as the leading federal case regarding zoning of adult businesses was not altered by the recent Supreme Court decision in *Barnes v. Glen Theatre, Inc.*, ___ U.S. ___, 115 L. Ed. 2d 504, 111 S. Ct. 2456 (1991) upholding a statute prohibiting public nudity against an attack by entities wishing to provide live nude dancing. The *Barnes* plurality stated that nude dancing is expressive conduct or "symbolic speech" which, under *United States v. O'Brien*, 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673 (1968), is not entitled to full First Amendment protection. *See Barnes*, 115 L. Ed. 2d at 512. In contrast, the written or filmed materials distributed by WWV are "pure" speech for the purposes of the First Amendment. By its own terms, the *Barnes* decision does not apply to "pure" speech; thus *Renton* remains the appropriate starting point for cases of this type.

▮ At the outset, the *Renton* Court stated:

> This Court has long held that regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.

(Citations omitted.) *Renton*, 475 U.S. at 46-47. The "substantial governmental interest" shown in *Renton* was that of combating the undesirable secondary effects of adult theaters. In a statement crucial to this case, the *Renton* Court noted:

> [T]he Renton ordinance is "narrowly tailored" to affect only that category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in *Schad* v. *Mount Ephraim*, 452 U. S. 61[, 68 L. Ed. 2d 671, 101 S. Ct. 2176] (1981), and *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205[, 45 L. Ed. 2d 125, 95 S. Ct. 2268] (1975).

*Renton*, 475 U.S. at 52. In contrast, Tukwila has not shown that adult businesses with predominantly "take-home" merchandise (which clearly are covered by the ordinance) have the same harmful secondary effects traditionally associated with adult movie theaters and peep shows; thus the "substantial governmental interest" portion of the test has not been met. Moreover, ordinance 1465 includes in its definition of adult bookstore, retail store, or video store any establishment in which:

> (A.) Ten percent or more of the "stock-in-trade" consists of [merchandise] distinguished or characterized by an emphasis on . . . "specified sexual activities" or "specified anatomical areas"; and/or
> (B.) Any person is excluded by virtue of age from all or part of the premises generally held open to the public where such [merchandise] is displayed or sold.

TMC 18.06.825(a)(2)(A), (B); *see* TMC 18.06.825(a)(6), (8). This definition would even include "mainstream" video stores that have restricted adult sections. Yet the trial court, in an unchallenged finding of fact, specifically found:

> None of the sources considered by Mr. Pace in conducting his study indicate that businesses which have their stock in trade limited to ten and a half percent sexually explicit material caused the same type of adverse secondary effect as businesses which have one hundred percent sexually explicit material.

Finding of fact 27. Again, no substantial governmental interest has been demonstrated. Therefore, the Tukwila ordinance is not sufficiently "narrowly tailored" to meet the federal standard.

■ Tukwila argues it should be permitted "to rely on the experiences of Seattle and other cities . . . in enacting its adult theater zoning ordinance", as the Supreme Court held the City of Renton was entitled to do. *Renton*, 475 U.S. at 51. However, that entitlement was qualified. The Supreme Court held a city could rely on evidence generated by others, "so long as whatever evidence the city

relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51-52. The Tukwila ordinance does not pass this test; it strives to regulate forms of expressive activity different from those studied in the materials upon which it relies. Because Tukwila has shown no substantial governmental interest that is served by regulating the numerous types of businesses covered by ordinance 1465, the ordinance is unconstitutional under the United States Constitution. We need not, and therefore do not, reach the question whether the ordinance "unreasonably limit[s] alternative avenues of communication".

We note also that the Ninth Circuit stated, subsequent to *Renton*, that

> five . . . justices in *Young* [*v. American Mini Theatres, Inc.*, 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976)] concluded that the degree of protection the first amendment affords speech does not vary with the social value ascribed to that speech by the courts. This view continues to govern.

(Citations omitted.) *Kev, Inc. v. Kitsap Cy.*, 793 F.2d 1053, 1058 (9th Cir. 1986). Thus a decision that pornography, though protected, should receive less protection than other types of speech would be constitutionally questionable at best, even under federal standards.

## IV

■ WWV argues the panoram licensing ordinance is unconstitutional under *Acorn Invs., Inc. v. Seattle*, 887 F.2d 219 (9th Cir. 1989) and *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 107 L. Ed. 2d 603, 110 S. Ct. 596 (1990). Although we reach a different conclusion than the one urged by WWV, these cases are indeed helpful in analyzing the Tukwila ordinance. As no argument was made pursuant to *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) for an application of Washington law to this issue, our analysis is only under federal law. We make no statement regarding whether the Washington constitution might support a different standard for licensing of this type.

## License Fees

■ WWV challenges the trial court's determination that the license fee provisions of TMC 5.52.050(a) are constitutional. Tukwila argues the fees are valid because they are based on the estimated time and cost involved in investigating license applications. Our rejection of finding of fact 45 is not fatal to this argument because there are likely to be other costs associated with the license system which were not made evident at trial. The inspections by entities other than the police department, for example, will not be without cost to the City. Thus, because the exact costs to Tukwila of the licensing procedure are unclear from the evidence presented and it is not always possible to estimate with precision the costs of a new licensing system, we are not prepared at this time to hold that the fees are excessive. If at a later date WWV could show the fees to be unreasonable in light of the actual costs to the City of administering the licensing program, as was done in *Acorn*, a successful challenge might then be brought.

## Disclosure Provisions

Next, WWV challenges the trial court's determination that the ownership disclosure provisions of TMC 5.52-.060(b) are constitutional. Relying primarily on *Acorn*, WWV argues the "or other interest" language in the ordinance is chilling because it arguably requires disclosure of too much information. The Seattle ordinance at issue in *Acorn* called for disclosure of the names of all shareholders. The Ninth Circuit held:

> Because officers and directors, not shareholders, are legally responsible for the management of a corporation's business, . . . there is no logical connection between the City's legitimate interest in compliance with the panoram ordinance and the rule requiring disclosure of the names of shareholders.

*Acorn*, 887 F.2d at 226.

■ Tukwila's "other interest" requirement could be construed to include persons with a relatively minor interest in the business, such as shareholders, and if so

construed the ordinance would be unconstitutional. However, "[w]herever possible, it is the duty of this court to construe a statute so as to uphold its constitutionality." *State v. Browet, Inc.*, 103 Wn.2d 215, 219, 691 P.2d 571 (1984). "The same rules of statutory construction apply to municipal ordinances as to state statutes." *Spokane v. Fischer*, 110 Wn.2d 541, 542, 754 P.2d 1241 (1988). Therefore, we construe the ownership disclosure provisions of TMC 5.52.060(b) as requiring disclosure of all persons who hold an interest *similar to* that of an owner or leaseholder — an "other *significant* interest", with significance being based on responsibility for management of the business, as indicated in *Acorn*. This construction also satisfies WWV's vagueness concerns by eliminating any inappropriate discretion that might have been vested in the licensing official. As so construed, the ordinance meets federal constitutional standards.

### Configuration Requirements

WWV further challenges the trial court's determination that the illumination requirement in TMC 5.52.110(4) (referred to as 5.52.110(D) in ordinance 1475) is constitutional. In *Acorn*, the court approved of the portion of the Seattle ordinance requiring that peep show booths "be sufficiently illuminated so that someone outside can determine the number of persons inside". *Acorn*, 887 F.2d at 223. WWV argues the Tukwila ordinance goes too far in requiring equal lighting throughout the premises rather than merely "sufficient" lighting. The trial court disagreed. We affirm. The minor difference from the ordinance noted in *Acorn* is within the community's discretion and is not unconstitutional.

### Time Period for Issuance

Finally, WWV challenges the trial court's determination that the 30-day maximum approval period in TMC 5.52.080(a) is constitutional. Contrary to WWV's

argument, 30 days is not necessarily too long a period, given the various inspections and investigations which must take place before licensing. In *FW/PBS*, the United States Supreme Court struck down a Dallas ordinance relating to regulation of "sexually oriented businesses" (including panoram-type businesses) because it "[did] not provide for an effective limitation on the time within which the licensor's decision must be made." *FW/PBS*, 110 S. Ct. at 606. The Court stated the following requirements:

> [1 T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained and [2] there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

*FW/PBS*, 110 S. Ct. at 606.

The Dallas ordinance, like the Tukwila ordinance, called for approval of license applications "within 30 days after receipt of an application", *FW/PBS*, 110 S. Ct. at 605; *see* TMC 5.52.080. In Dallas, as in Tukwila, certain health and safety inspections were required before a license might be approved. *FW/PBS*, 110 S. Ct. at 605; *see* TMC 5.52.060(a), .080(b)(1). The Court found the Dallas ordinance unacceptable, not because of the 30-day time period, but rather because it "provide[d] no means by which an applicant [might] ensure that the business [be] inspected within the 30-day time period within which the license [was] purportedly to be issued if approved." *FW/PBS*, 110 S. Ct. at 605. The Supreme Court did not find the 30-day period *inherently* problematic. Its disapproval of the Dallas ordinance was instead based on the absence of any remedy if the City failed to issue a license within those 30 days.

There is thus one crucial difference between the Dallas and Tukwila ordinances: The Tukwila ordinance contains provisions for appeal if a license is denied. The Supreme

Court noted that the procedures described in the Dallas ordinance

[do] not place any limits on the time within which the city will inspect the business and thereby make the business eligible for the sexually oriented business license. Thus, the city's regulatory scheme allows indefinite postponement of the issuance of a license.

*FW/PBS*, 110 S. Ct. at 606. In contrast, TMC 5.52.100(a) provides for review by "the city board of adjustment, or . . . such other hearing body as may hereafter be established by the city council for the hearing of such appeals". The hearing must take place within 20 days after notice of appeal is timely filed, and "[t]he filing of such appeal shall stay the action of the clerk, pending the decision of the hearing body." TMC 5.52.100(b). The Tukwila ordinance further provides that the decision of the hearing body may be appealed to the superior court. TMC 5.52.100(e). As long as these procedures for appeal are not used as a means of unreasonably delaying issuance of licenses, they are sufficient to satisfy the *FW/PBS* test.

V

The decision of the trial court is affirmed.

UTTER, BRACHTENBACH, ANDERSEN, SMITH, GUY, and JOHNSON, JJ., concur.

DORE, C.J. (concurring in part, dissenting in part) — I concur with the majority's decision upholding the peep show licensing ordinance, but I dissent from its holding that the adult bookstore zoning ordinance is unconstitutional. Tukwila or any other municipality should be free to manage commercial development by zoning procedures. That means the city may determine where adult bookstores should be located, so long as this determination (1) only affects protected speech slightly or neutrally and (2) furthers the city's "great interest" in neighborhood quality. *Northend Cinema, Inc. v. Seattle*, 90 Wn.2d 709, 718, 585 P.2d 1153, 1 A.L.R.4th 1284 (1978), *cert. denied*, 441 U.S. 946 (1979).

World Wide Video, the challenger to the zoning ordinance in question, operates an adult bookstore and peep shows in a commercial zone bordering a residential area of Tukwila. World Wide Video argues that the zoning is an unconstitutional restriction on expression. Tukwila's ordinance segregates adult bookstores and peep shows to one area, the M-2 heavy industrial zone, but does not prohibit their operation. This ordinance resulted from a planning study that considered other cities' experiences in zoning adult businesses. Tukwila's method concentrated these businesses in an area comprising about one-fifth of the city.

The majority concludes that Tukwila does not show the substantial governmental interest that *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986) required. In *Renton*, the Court upheld as constitutional the City's effort to establish 1,000-foot buffers between adult movie theaters and residential areas, churches, parks and schools. *Renton* established the City's substantial governmental interest to be in furthering neighborhood quality by traditional zoning powers, which amounts to time, place or manner restrictions on expression where the effect on speech content is neutral. 475 U.S. at 47.

> In sum, we find that the Renton ordinance represents a valid governmental response to the "admittedly serious problems" created by adult theaters. . . . Renton has not used "the power to zone as a pretext for suppressing expression," . . . but rather has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zoning.

475 U.S. at 54.

Here, the majority reasons that Tukwila improperly founded its adult bookstore and peep show ordinance on the experiences of other cities regulating adult theaters because Tukwila's zoning regulates a predominantly take-home business, different in nature from adult movie theaters. Majority, at 389-90. Moreover, the majority calls

Tukwila's definition of adult bookstores so broad[1] that it arguably includes "mainstream" video stores, thus compounding the City's failure to show a "narrowly tailored" substantial governmental interest. Majority, at 389.

*Renton* and its predecessor, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976), unmistakably address the need for cities to protect neighborhoods against the insidious effects of adult entertainment — just as cities traditionally control other commercial development. We recognized the same value in *Northend Cinema.*

Tukwila's need to control development and its effects is the substantial governmental interest that *Renton* requires. Therefore, the City is restricted in exercising that need only by assuring "reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50. The City's " 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.' " *Renton*, at 50 (quoting *Young*, 427 U.S. at 71). Likewise, our focus in *Northend Cinema*, as now, narrowed on the City's determination to control unwanted secondary effects of adult businesses in otherwise serene neighborhoods.

The majority catches one phrase of the proper analysis. But it misses the point by finding Tukwila's ordinance is not so narrowly tailored to meet *Renton*'s substantial governmental interest test. In *Renton* plaintiffs objected to zoning that established certain buffers between adult movie houses and residential areas, churches and schools.

---

[1]Tukwila Ordinance 1465 defines "adult entertainment establishments" as including:

2. "Adult bookstore" is a retail establishment in which:

a. Ten percent or more of the "stock in trade" consists of books, magazines, posters, pictures, periodicals or other printed materials distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or

b. Any person is excluded by virtue of age from all or part of the premises generally held open to the public where such material is displayed or sold.

Former TMC 18.06.825(A)(2)(a), (b).

The Court rejected the argument that Renton improperly enacted its zoning regulation because it did not conduct studies specifically related to Renton's problems. 475 U.S. at 50. Then the Court stated:

> The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is *reasonably believed to be relevant* to the problem that the city addresses.

(Italics mine.) 475 U.S. at 51-52. The protected interest is neighborhood quality, so the relevance the majority finds lacking is the riddance of the same obnoxious effects associated with an adult business clientele, whether at movie theaters or peep shows. See, *e.g.,* Clerk's Papers, at 376 (deposition of World Wide Video manager, discussing evidence of masturbation in peep show stalls).

The majority also overlooks one critical distinction in reaching its conclusions. Ordinances at issue in *Renton* and *Young* each were broad enough to cover the type of adult business World Wide Video operates in Tukwila. For example, Renton's zoning ordinance defined an adult theater as

> "[a]n enclosed building used for presenting motion picture films, video cassettes, cable television, or any other such visual media, distinguished or characteri[zed] by an emphasis on matter depicting, describing or relating to 'specified sexual activities' or 'specified anatomical areas'. . . for observation by patrons therein."

*Renton,* 475 U.S. at 44. Thus, by its terms, the Renton ordinance arguably includes peep shows. In *Young* the plaintiffs challenged the constitutionality of a zoning ordinance regulating adult bookstores as well as adult movie theaters. *Young,* 427 U.S. at 53 n.5.

Recognizing that *Renton* built on *Young*[2] gives substance to broad language in those decisions emphasizing that the issue is zoning regulation and not speech restric-

---

[2] "In our view, the resolution of this case is largely dictated by our decision in *Young* v. *American Mini Theatres, Inc.*[]". 475 U.S. at 46.

tion. The nuisance is blight, not unpopular expression. Regulation of blight, of the unwanted secondary effects associated with businesses that purvey explicit sexual books, tapes, gags and peep shows, is proper commercial zoning. The narrow tailoring that the majority complains is missing in Tukwila's ordinance I find easily discerned in the City's categorization of adult businesses that sell and show explicit materials, so designated to protect the quality of city neighborhoods. *Cf. Renton*, 475 U.S. at 52 ("the Renton ordinance is 'narrowly tailored' to affect only that category of theaters shown to produce the unwanted secondary effects").

In addition, the Court in *Renton* appeared to disregard the subtle difference between adult movie theaters, on one hand, and other adult businesses. Rejecting an argument that the Renton ordinance was underinclusive, because it affected only adult theaters, the Court stated:

> That Renton chose first to address the potential problems created by one particular kind of adult business in no way suggests that the city has "singled out" adult theaters for discriminatory treatment. We simply have no basis on this record for assuming that Renton will not, in the future, amend its ordinance to include other kinds of adult businesses *that have been shown to produce the same kinds of secondary effects* as adult theaters.

(Italics mine. Citation omitted.) 475 U.S. at 52-53. My added emphasis is noteworthy because the Court did not say "other kinds of adult businesses that *can be* shown. . . ." This emphasis bolsters my conclusion that Tukwila reasonably believed other cities' studies on the secondary effects of adult businesses were relevant to its zoning consideration. Many courts that have considered adult business zoning restrictions have adapted *Renton*'s reasoning easily to uses broader than adult movies. *See, e.g., Walker v. Kansas City*, 911 F.2d 80 (8th Cir. 1990) (go-go dancing), *cert. denied*, ___ U.S. ___, 114 L. Ed. 2d 476, 111 S. Ct. 2234 (1991); *Thames Enters., Inc. v. St.*

*Louis*, 851 F.2d 199 (8th Cir. 1988) (adult bookstores, theaters, peep shows, massage parlors); *7250 Corp. v. County Comm'rs*, 799 P.2d 917 (Colo. 1990) (time restrictions on nude dancing); *County of Cook v. Renaissance Arcade & Bookstore*, 122 Ill. 2d 123, 522 N.E.2d 73 (1988) (bookstores, mini-theatres), *dismissed*, 488 U.S. 882 (1988); *Montague v. Cedar Rapids*, 449 N.W.2d 91 (Iowa Ct. App. 1989) (bookstores); *Islip v. Caviglia*, 73 N.Y.2d 544, 540 N.E.2d 215, 542 N.Y.S.2d 139 (1989) ("adult uses", including bookstores, cabarets).

Tukwila's ordinance is, in the end, reasonable zoning, as the Court found the ordinance to be in *Renton*. 475 U.S. at 54; *cf. Barnes v. Glen Theatre, Inc.*, ___ U.S. ___, 115 L. Ed. 2d 504, 111 S. Ct. 2456 (1991) (Souter, J., concurring) (ban on nude public dancing furthers substantial state interest in combating secondary effects of adult entertainment establishments).

The majority misses the singular reasoning in *Renton*, *Young*, and *Northend Cinema*: A city can determine where adult bookstores or peep shows or full-screen adult movie theaters can be located on the basis of its substantial interest in neighborhood quality, so long as it does not prohibit these businesses altogether. Here, Tukwila has not employed "'the power to zone as a pretext for suppressing expression" and seeks principally to preserve the "quality of life in the community at large". 475 U.S. at 54.

I would hold that the City properly zoned adult bookstores to one area and that the ordinance is not unconstitutional. I would affirm the decision of the City of Tukwila and reverse the trial court.

DURHAM, J., concurs with DORE, C.J.

Reconsideration denied November 25, 1991.