IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of: | ) | |
| | ) | No. 41291-1-III |
| | ) | |
| E.B.[†] | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

COONEY, J. — Following trial, the court granted the Department of Children, Youth, and Families' (Department) petition to terminate the parent-child relationship between T.H. and his son, E.B. T.H. appeals, arguing (1) the Department failed to prove, and the court erroneously concluded, that the Department made an effort to support a guardianship as an alternative to termination, and (2) the court erred in concluding that termination was in E.B.'s best interest. The Department concedes the trial court's finding regarding the Department's effort to support a guardianship is not supported by substantial evidence. We accept the Department's concession yet affirm because the erroneous finding does not materially affect the trial court's conclusions of law. We

---

[†] To protect the privacy interests of E.B., we use their initials throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective Sept. 1, 2018) http://www.courts.wa.gov/appellate_trial_courts.

disagree with T.H.'s contention that the court erred in concluding termination of the parent-child relationship was in E.B.'s best interest.

## BACKGROUND

In 2019, the Department received a report of bruising on E.B.'s face and body. He was eight years old at the time. A dependency petition was filed, and E.B. was found dependent. A disposition order was later entered that required E.B.'s father, T.H., to engage in several services to remediate his parental deficiencies. A petition to terminate the parent-child relationship between E.B. and his parents was filed on November 4, 2021.[1] Trial on the petition was held in April 2025.

At trial, Samantha Mbow, the first social worker assigned to E.B.'s case in 2019, testified that the Department had concerns about E.B.'s cognitive functions and physical issues. Once removed from T.H.'s care, E.B.'s physical issues subsided and his cognitive and psychosocial issues improved.

Ms. Mbow testified that T.H. was engaged in counseling when the dependency was filed. The Department then referred T.H. for a neuropsychological assessment and an evidence-based parenting program. Although T.H. was originally willing to engage in services, Ms. Mbow testified T.H. did not recognize why the services were necessary and became resistant to the providers and their goals. In February 2021, T.H. was discharged

---

[1] E.B.'s mother relinquished her parental rights in December 2024, and the court terminated her parental rights in January 2025.

from mental health counseling due to "verbal aggression" toward his provider. Rep. of Proc. (RP) at 66. During discharge, the provider noted T.H. had made no progress in his mental health goals.

James Renner testified that he provided family therapy to E.B. and T.H. between 2020 and 2022. Mr. Renner thought "both of them care extremely for each other" and exhibited good interactions during therapy. RP at 169. Mr. Renner stated T.H. and E.B. would meet with him at least once a week for one hour, and T.H. had made little improvement by the time their therapy sessions had ended. Mr. Renner ceased providing family therapy after T.H. "became extremely upset" about the upcoming termination hearing during the last session. RP at 167. During the outburst, Mr. Renner had to remove E.B. from the office and return him to his foster parent. T.H. "follow[ed] [Mr. Renner] out to the foster parent and . . . continued to kind of yell and express pretty loudly his feelings." RP at 167. Mr. Renner ended the family therapy because he felt T.H. needed to first work on himself.

Jennifer Pilkinton testified that she is a social service specialist with the Department who had been assigned to E.B.'s case since September 2024. Ms. Pilkinton attempted to reengage T.H. in a neurological evaluation, mental health services, and domestic violence services. Ms. Pilkinton tried "to meet [T.H.] where he was." RP at 219-20. At T.H.'s request, Ms. Pilkinton watched sermons on YouTube given by Jesse Lee Peterson, a pastor T.H. watches daily. Ms. Pilkinton testified, "[T.H.] was very

passionate and motivated by Jesse Lee Peterson." RP at 219. In Ms. Pilkinton's opinion, the sermons did not qualify as mental health therapy because they lacked individuality. Ms. Pilkinton testified T.H. has a history of "anger outbursts, calling of names, profanities, and screaming and yelling" during visitations. RP at 252. Ms. Pilkinton was of the opinion E.B. could not be safely returned to T.H.'s care.

Ms. Pilkinton testified E.B. had "just really blossomed" while she was assigned to his case. RP at 222. She stated T.H. had not had any visits with E.B. since she was assigned to the case, and there was currently no relationship between E.B. and T.H. Ms. Pilkinton testified that E.B. wished to stay with and be adopted by his current placement, who were prepared for the adoption once legally allowed to do so. She believed it was in E.B.'s best interest to terminate T.H.'s parental rights so E.B. could gain the "structure, stability, and permanency" of adoption. RP at 237.

Ms. Pilkinton testified that after considering E.B.'s wishes, his fearfulness of returning to T.H.'s care, and his current placement's intent to adopt him, a guardianship would not be a viable alternative to termination. She stated that it would be "very detrimental to [E.B.] and his own mental health and his own structure and stability" if he returned to his father. RP at 236. She explained E.B. wants to be somewhere he "feels safe and secure." RP at 238.

Constance Shields testified she was appointed as E.B.'s guardian ad litem (GAL) in January 2020. She reported that E.B. was having medical problems, trouble in school

and with his peers, and difficulty conversing when they first met. She testified that, by the time of trial, E.B. was doing well in school and had been released from counseling. Ms. Shields stated E.B. had security for the first time in his life, and he wants the stability of adoption.

Ms. Shields stated she had a few in-person conversations with T.H. before choosing to communicate by text messages due to T.H.'s anger and threats. Ms. Shields believes termination is in E.B.'s best interest because he deserves stability, and it will not "preclude a relationship with his father on down the road." RP at 281. E.B. told Ms. Shields that "[h]e wants to see his father sometime, like maybe when he can drive." RP at 279. Ms. Shields stated E.B. is very settled where he is and wants to be adopted. When asked if she supported E.B.'s adoption by his current placement, Ms. Shields testified:

> I support the plan because actually the [current placement] were
> people that [T.H.] picked. So, it's family that is familiar with [E.B.'s
> family]. They have a history . . . the [current placement] are able to
> meet [E.B.'s] needs. . . they love him very much. And he's
> integrated into their household.

RP at 283. Ms. Shields testified that, although she had not discussed a guardianship with E.B.'s current placement, a guardianship would not be an option because his current placement desires the permanency of adoption. Ms. Shields opined that termination is in E.B.'s best interest.

Jon Christensen, PhD, completed a neuropsychological evaluation of E.B. in 2020. Dr. Christensen noted concerns with E.B.'s working memory, executive functioning, and mild visual motor skills. Dr. Christensen diagnosed E.B. with attention deficit hyperactivity disorder, mild depression, mild anxiety disorder, and a reading disorder. With these diagnoses, Dr. Christensen opined E.B. would need a caregiver who would provide him with enhanced oversight and supervision.

Dr. Christensen also completed a neuropsychological evaluation of T.H. in 2020. Dr. Christensen diagnosed T.H. with "specified disruptive impulsivity conduct disorder," "[a] cognitive disorder related to [T.H.]'s stroke[2] that caused cognitive difficulties such as attention, memory, and learning, executive functioning difficulties," "[r]eading disorder," and "other specified anxiety disorder." RP at 328. Dr. Christensen remarked that T.H.'s "diagnoses could definitely affect his ability to parent unless it was taken care of and helped." RP at 332.

T.H. testified he suffered a TBI in 2008. He left treatment for his TBI against medical advice and could not recall receiving any further treatment. T.H. does not believe he has any lasting symptoms from the TBI. T.H. testified he entered an "*Alford*[3] plea" for an assault he committed against E.B. that led to the Department removing E.B. from his care. RP at 20-21. T.H. stated he receives counseling daily by

---

[2] T.H. testified he experienced a traumatic brain injury (TBI) in 2008.

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

6

watching Jesse Lee Peterson's sermons, and he no longer has angry outbursts. T.H. recalled he participated in counseling with Stephanie Lytle, but "she did not help [him] at all." RP at 24. He also participated in a parenting program that taught him some skills but feels the program is no longer necessary.

T.H. testified that he and E.B. received family therapy from Mr. Renner. He recalled some of the sessions went well but he had an outburst at the last meeting, about three years earlier, that led to the cancellation of further sessions. T.H. had not participated in family therapy since. He commented that therapy is not necessary "since [he has] gotten rid of [his] anger." RP at 32.

T.H. testified that he receives letters from the social worker, Ms. Pilkinton, every month outlining the services that are being offered to him, but he does not believe it is necessary to complete any of the services because it is "[a] bunch of stuff that was nonsense." RP at 21. T.H. stated that he receives Social Security disability income (SSDI) every month.

T.H. testified his last visit with E.B. was more than three years prior to trial. T.H. was aware he could have remote visits with E.B., but he refuses to attend if the visit is supervised. T.H. remarked, "I am not going to—I don't need to see my son with somebody else looking over my shoulder." RP at 35. He testified he feels his situation has improved since E.B. was taken from his care. He stated he is still working on himself daily.

No. 41291-1-III
*In re the Welfare of E.B.*

At the conclusion of trial, the court found by clear, cogent, and convincing evidence that continuation of the parent-child relationship between T.H. and E.B. clearly diminishes E.B.'s prospects for early integration into a permanent and stable home. Specifically, the court found:

> 2.9.1 [E.B.] is thirteen years old and has lived with suitable others, [current placement], for over three years where he has been stable and happy. The continuation of the legal relationship between [E.B.] and [T.H.] diminishes the final connection piece of early integration into the stable and permanent home that is currently meeting his daily needs. This home is the proposed adoptive home for [E.B.].
>
> 2.9.2 [The Department] made efforts to support a potential Title 11 or Title 13 guardianship as an option for the child's permanency, but the [current placement] do[es] not consent to guardianship. [The Department] cannot force a party into a guardianship who is unwilling, and it would be unreasonably disruptive to move [E.B.] to a placement that is willing to enter into a guardianship. The court finds that guardianship is not available as permanent option for [E.B.].

Clerk's Papers (CP) at 310. The court found T.H. unfit to parent E.B. and that it was in E.B.'s best interest to terminate the parent-child relationship. The court concluded that the elements of RCW 13.34.180(1) had been proved by clear, cogent, and convincing evidence. The court further concluded that the Department had established, by a preponderance of the evidence, that termination of the parent-child relationship is in E.B.'s best interest. Consequently, T.H.'s parental rights to E.B. were terminated.

T.H. timely appeals.

8

ANALYSIS

T.H. first contends the Department failed to prove, and the court erroneously concluded, that the Department made an effort to support a guardianship as an alternative to termination. He also argues the court erred in concluding that termination was in E.B.'s best interest. We disagree with both of T.H.'s arguments.

An order terminating parental rights must be affirmed if substantial evidence supports the trial court's findings in light of the degree of proof required. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Substantial evidence is evidence in "'sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991) (quoting *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)). The trial court's decision is entitled to great deference, and its findings of fact must be upheld when supported by substantial evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). The reviewing court may not reweigh the evidence or decide witness credibility. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

To terminate a parent's parental rights, the Department must prove all six elements of RCW 13.34.180(1) "by clear, cogent, and convincing evidence" and prove by a preponderance of the evidence that termination would be in the child's best interest. *In re Dependency of G.C.B.*, 28 Wn. App. 2d 157, 171, 535 P.3d 451 (2023).

9

CONSIDERATION OF A GUARDIANSHIP

T.H. argues substantial evidence does not support the trial court's finding that the Department made efforts to support a guardianship as a permanent option for E.B.; thus the court's conclusion that the Department proved the elements of RCW 13.34.180(1)(f) is unsupported. The Department and E.B. respond that sufficient evidence was presented to support a finding that a continuation of the parent-child relationship would diminish E.B.'s prospects of integrating into a stable and permanent home under RCW 13.34.180(1)(f). We agree with the Department and E.B.

RCW 13.34.180(1)(f) requires a supported finding that the "'continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home'" before the court can terminate a parent's rights. *Id.* (quoting RCW 13.34.180(1)(f)). RCW 13.34.180(1)(f) can be satisfied by a showing that the "prospects for a permanent home exist but continuing the parent-child relationship prevents the child from obtaining that placement" or "parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into a permanent home." *Id.* at 171-72. Under RCW 13.34.180(1)(f), "the court must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child."

T.H. argues findings of fact 2.9, 2.9.1, and one sentence in 2.11 are not supported by substantial evidence. The challenged findings read:

> 2.9. Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a permanent and stable home.
>
> 2.9.1 [E.B.] is thirteen years old and has lived with suitable others, [current placement], for over three years where he has been stable and happy. The continuation of the legal relationship between [E.B.] and [T.H.] diminishes the final connection piece of early integration into the stable and permanent home that is currently meeting his daily needs. This home is the proposed adoptive home for [E.B.].
>
> 2.11 . . . Without termination of parental rights, [E.B.] will be left in the limbo of dependency, which is not in his best interest. . . .

CP at 309-10. These findings are supported by substantial evidence.

Concerning findings of fact 2.9, 2.9.1, and 2.11, evidence was presented that E.B. was eight years old when he entered into foster care. During the five years the dependency was pending, E.B. lived with two different relatives and two foster families before residing with his current placement. During this period, T.H. had made little progress remediating his parental deficiencies. Consequently, E.B. remained dependent. Further, Ms. Pilkinton and Ms. Shields both testified that a continuation of the parent-child relationship precluded E.B.'s prospects for early integration into the home of his current placement. Evidence was presented that E.B.'s current placement is willing and intent on adopting E.B. Thus, findings of fact 2.9, 2.9.1, and 2.11 are supported by substantial evidence.

T.H. next argues finding of fact 2.9.2 and 2.14 are not supported by substantial evidence. Finding of fact 2.9.2 states:

> 2.9.2 [The Department] made efforts to support a potential Title 11 or Title 13 guardianship as an option for the child's permanency, but the [current placement] do[es] not consent to guardianship. [The Department] cannot force a party into a guardianship who is unwilling, and it would be unreasonably disruptive to move [E.B.] to a placement that is willing to enter into a guardianship. The court finds that guardianship is not available as a permanent option for [E.B.].

CP at 310.

Finding of fact 2.9.2, is supported by substantial evidence except for the portion stating, "[The Department] made efforts to support a potential Title 11 or Title 13 guardianship as an option for the child's permanency." CP at 310. E.B.'s current placement wishes to adopt E.B. They are therefore inherently unsupportive of a guardianship that would, as Ms. Shields testified, preclude their ability to adopt E.B. Likewise, Ms. Pilkinton testified that it was in E.B.'s best interest that T.H.'s parental rights be terminated so E.B. could gain the "structure, stability, and permanency" of adoption. RP at 237. However, the portion of finding in 2.9.2 stating, "[The Department] made efforts to support a potential Title 11 or Title 13 guardianship as an option for the child's permanency" is unsupported by substantial evidence in the record. CP at 310. Nevertheless, as discussed below, this unsupported finding does not affect the court's conclusions of law.

Turning to T.H.'s next challenged finding, finding of fact 2.14 states:

> 2.14 The Department worked with the parties and child's permanent placement options to consider title 13 guardianship and title 11 guardianship as alternatives to adoption. The Department has held permanency meetings and provided placement options with resources and

12

> information about guardianship. A guardianship is not anticipated as a
> permanent option for this child.

CP at 311. The Department concedes this finding is not supported by substantial

evidence because witnesses testified that a guardianship was not discussed with E.B. nor

with his current placement. Notwithstanding the Department's concession, the

unsupported finding does not affect the court's conclusions of law.

As it relates to the erroneous portion of finding of fact 2.9.2 and the completely

unsupported finding of fact 2.14, "an erroneous finding of fact not materially affecting

the conclusions of law is not prejudicial and does not warrant a reversal." *State v.

Caldera*, 66 Wn. App. 548, 551, 832 P.2d 139 (1992). Here, the trial court made other

findings that supported its conclusion that a continuation of the parent-child relationship

between T.H. and E.B. would diminish E.B.'s prospects for integration into a permanent

and stable home.

Whether a guardianship is available as an alternative to termination is a case

specific inquiry. *G.C.B.*, 28 Wn. App. 2d at 173. Indeed, termination may be appropriate

even when a guardianship is available. *Id.* at 174; *In re Welfare of R.H.*, 176 Wn. App.

419, 429, 309 P.3d 620 (2013). The plain language of RCW 13.34.180(1)(f) "requires

the trial court to consider the viability of guardianship as *a factor* when assessing whether

the Department has shown that 'continuation of the parent and child relationship clearly

diminishes the child's prospects for early integration into a stable and permanent home.'"

*G.C.B.*, 28 Wn. App. 2d at 173 (emphasis added) (quoting RCW 13.34.180(1)(f)).

13

The essence of RCW 13.34.180(1)(f) is the "'continued effect of the *legal* relationship between parent and child, as an obstacle to adoption,'" especially where the child has potential adoption resources. *In re Dependency of A.M.F.*, 1 Wn.3d 407, 417, 526 P.3d 32 (2023) (quoting *In re Dependency of A.C.*, 123 Wn. App. 244, 250, 98 P.3d 89 (2004)). Consequently, RCW 13.34.180(1)(f) can be satisfied "when the parental relationship is an impediment to a legal, permanent placement in an adoptive home." *Id.* at 418.

In *G.C.B.*, the court relied on testimony that guardianship was not viable because "the children were thriving in their current placement, and a guardianship would keep them 'in limbo' with negative 'consequences.'" *G.C.B.*, 28 Wn. App. 2d at 174. There, the father argued no evidence was offered showing the Department considered his "proposed guardianship with the current caregivers." *Id.* at 173. Notwithstanding the father's argument, the court noted the dependency action had been ongoing for seven years, the father had not seen his children in five years, and the children's caregiver preferred adoption and had been approved for adoption. *Id.* at 174-75. In affirming the termination of the father's parental rights, this court held that the Department's consideration of a guardianship is but one factor for the court to consider. *Id.* at 174.

Here, the court found that E.B. is "stable and happy" with his prospective adoptive family and that the continuation of the "legal relationship" between E.B. and T.H. "diminishes the final connection piece of early integration into the stable and

14

permanent home" of E.B.'s current placement. CP at 310. Regardless of the court's partial erroneous finding of fact 2.9.2 and unsupported finding of fact 2.14, the court's other supported findings, in turn, support the court's conclusion that RCW 13.34.180(1)(f) had been proved by clear, cogent, and convincing evidence.

BEST INTEREST OF THE CHILD

T.H. next argues the court erred in concluding that termination was in E.B.'s best interest under RCW 13.34.190(1)(b). Specifically, T.H. claims that because the court erred in finding RCW 13.34.180(1)(f) was met, it could not have found that termination was in E.B.'s best interest. T.H. also argues that E.B. would benefit from maintaining the parent-child relationship because E.B. could receive his SSDI if he dies, and because E.B. desires a relationship with him. We disagree with his contentions.

Once the elements of RCW 13.34.180(1) have been met, the Department must then "establish that termination of parental rights would in the child's best interest by a preponderance of the evidence." *G.C.B.*, 28 Wn. App. 2d at 171; *see also* RCW 13.34.190.

T.H. argues that, as a matter of law, the trial court could not reach the question of E.B.'s best interest because the Department failed to prove RCW 13.34.180(1)(f). As discussed above, the Department met its burden under RCW 13.34.180(1). We therefore reject this argument.

No. 41291-1-III
*In re the Welfare of E.B.*

T.H. next claims E.B.'s best interest would be served through a guardianship because E.B. could still receive his SSDI once he passes away and because E.B. desires a relationship with him.

E.B.'s current placement has expressed their intent to adopt E.B., which cannot occur until T.H.'s parental rights are terminated. The potential for E.B. to potentially acquire T.H.'s SSDI does little to outweigh the stability and permanency E.B. will attain through adoption. Lastly, termination of T.H.'s parental rights does not preclude a relationship with E.B. in the future if both are interested in fostering such a relationship. The trial court did not err in concluding that termination is in E.B.'s best interest.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____       _____
Staab, C.J.                                  Hill, J.