**ACORN INVESTMENTS, INC.,**
**Plaintiff–Appellant,**

v.

**CITY OF SEATTLE; Walter Tank;**
**Douglas Jewett,**
**Defendants–Appellees.**

No. 88–3657.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 1989.

Decided Oct. 5, 1989.

**220**

Jack R. Burns, Burns and Hammerly, P.S., Seattle, Wash., for plaintiff-appellant.

R. James Pidduck, Asst. City Atty., Seattle, Wash., for defendants-appellees.

Before GOODWIN, Chief Judge, and WRIGHT and NORRIS, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Acorn Investments, Inc. owns and operates panoram machines at four adult entertainment centers in the City of Seattle. When a customer inserts one or more quarters into a panoram, the machine exhibits a video tape or motion picture on a screen for a few minutes.[1] A customer may also view live entertainment through a panoram. Each panoram is located in a booth that gives individual patrons some degree of privacy.

In this action, Acorn attacks as violative of the First Amendment city laws that require panoram businesses to pay various license fees and to disclose the names and addresses of shareholders. The district court awarded the City summary judgment on the shareholder disclosure issue and, after a one-day bench trial, ruled in favor of the City on the license fee issue. We reverse on both issues.

I

THE CITY'S PANORAM
LICENSING ORDINANCE

The Seattle ordinance licensing panorams dates back to 1955.[2] As originally enacted, the ordinance required panoram businesses to obtain two separate licenses, a Panoram Location License and a Panoram Operator License. The fee in 1955 for a Panoram Location License was $25 per panoram machine per annum, and the fee for a Panoram Operator License was $300 per annum. In 1961, the City amended the ordinance to require the following three licenses and fees: Panoram Location License—$5 per machine per annum; Panoram Sub–License—$5 per machine per annum; Panoram Operator License—$500 per annum plus 5% of the total gross income of all machines operated. These three licenses have been required ever since; the current fee schedule is as follows: Panoram Location License—$30 per machine per annum; Panoram Sub–License—$30 per machine per annum; Panoram Operator License—$650 per annum, plus $25 per month per machine. Seattle Municipal Code (SMC) 6.42.030.[3]

In 1987, the City collected panoram license fees of $86,715 from Acorn and the seven other businesses operating panorams in the City during that year. The cost to the City of administering the panoram licensing program for all panoram establishments in 1987 was approximately $2,040, while the cost of providing police surveillance at panoram establishments was approximately $65,068.

---

1. The Seattle ordinance governing panorams refers to them as "peepshows." Seattle Municipal Code (SMC) 6.42.010.

2. Since 1955 panorams have also been subject to zoning restrictions. Like adult theatres, panorams are prohibited "within three hundred feet of the grounds or building of any public or private elementary and secondary schools." SMC 6.42.120.

3. The City increased the fees periodically from the 1961 levels. These increases occurred in 1968, 1980, and again in 1987.

Acorn filed this action in 1987, claiming that the City discriminates against the owners and operators of panoram machines in violation of the First Amendment by taxing and licensing the machines differently from other coin-operated amusements.[4] Acorn based its claim on *Minneapolis Star v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), where the Supreme Court struck down a taxation scheme which treated the press differently from other businesses because the scheme was not necessary "to achieve an overriding governmental interest." *Id.* at 582, 103 S.Ct. at 1370. As the Court explained, "differential treatment [of the press], unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* at 585, 103 S.Ct. at 1372.

The City, on the other hand, argued to the district court that *Minneapolis Star* was inapposite because the license fees on panorams are in fact justified by a special characteristic of the panoram booths—their privacy makes them convenient places for criminals to plan or engage in illegal activity such as dealing drugs or fencing stolen property. The City contended that the license fees are used to offset the cost of increased police surveillance required by the privacy and location of the panorams. Specifically, the City pointed to the cost of increased police surveillance and inspection of panoram booths located in a high crime area of downtown Seattle between First, Second, Pike and Pine Streets, known as "the Block." The City did not argue that panorams located off "the Block" pose any special law enforcement problems.[5]

In arguing its case, the City relied heavily upon *City of Renton v. Playtime Theatres*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), in which the Supreme Court upheld against First Amendment challenge a municipality's attempt to zone adult theatres to keep them away from schools, churches, residences and parks. In *Renton*, the Court was faced with a zoning ordinance which was "aimed not at the content of the films shown at 'adult motion picture theatres,' but rather at the secondary effects of such theatres on the surrounding community." *Id.* at 47, 106 S.Ct. at 929 (emphasis omitted). The Court held that the Renton ordinance was constitutional because Renton had proven that adult theatres generate specific harmful "secondary effects" on neighborhoods, and had selected a reasonable means for preventing these effects. *Id.* at 52, 106 S.Ct. at 931.

The district court rejected Acorn's reliance on *Minneapolis Star* and accepted the City's analogy to *Renton*. The court held that the City's panoram licensing scheme, like the zoning provision at issue in *Renton*, was an "attempt[ ] to control the secondary effects of panorams," and not an attempt "to regulate the content of the videos shown on the machines." Excerpts of Record ("E.R.") at 7. The district court then ruled that the license fee scheme was constitutional because it furthered a substantial government interest and allowed for reasonable alternative avenues of communication—the standard for content-neutral time, place and manner regulations the Supreme Court applied in *Renton*. *See* 475 U.S. at 50, 106 S.Ct. at 930.

In applying the *Renton* test, the district court found that panorams on "the Block" generate "adverse effects on the areas in which they operate" because they contribute to "the Block's" crime problem. E.R. at 8. The district court stated that "the Block" is "the City's focal point for prostitution, drug sales, robberies, assaults and other street crime[s]" and while "panorams

---

**4.** It is undisputed that at least some, if not all, of the video tapes and live entertainment viewed in Acorn's panorams are protected by the First Amendment.

**5.** Five of the nine licensed panoram locations in the City are on "the Block." Although the record does not indicate precisely how many of

the City's individual panorams are located on "the Block," the record does show that in 1986, panoram establishments located off "the Block" paid 52.7% of the total panoram license fees collected, and in 1987, these "off Block" panorams accounted for 47.7% of the license fee revenue.

are not the sole cause of the criminal conduct, they contribute substantially to it." E.R. at 31–34. The district court found that the City had a substantial governmental interest in trying to prevent the secondary effects created by the panorams. Thus, the district court concluded that the City had satisfied the requirement of *Renton* that the ordinance serve a substantial governmental interest. The district court also concluded, without elaboration, that the licensing scheme satisfied the other requirement of *Renton* that the ordinance allow for adequate alternative avenues of communication.

Acorn argues on appeal, as it did below, that the City's licensing ordinance should be analyzed not under the *Renton* standard but rather under the *Minneapolis Star* "necessary to achieve an overriding governmental interest" test. Whether the more stringent *Minneapolis Star* standard applies is a question we need not reach, however, because we find persuasive Acorn's alternative argument that the license fee scheme cannot survive scrutiny even under the *Renton* test for content-neutral time, place or manner regulations.

The City maintains that the licensing fees further a substantial governmental interest, because they force panoram businesses to shoulder some of the police costs incurred by the City to combat the criminal activity taking place inside the panoram establishments. Acorn does not dispute the City's contention that requiring panoram businesses to pay for these costs would be a substantial governmental interest if panorams posed a special law enforcement problem. Acorn argues, however, that the City has completely failed to prove that panorams on "the Block" are currently conducive to criminal transactions. Acorn points out that even under the *Renton* analysis, a city must prove the existence of the "secondary effects" it is seeking to prevent. *See Renton*, 475 U.S. at 50–51, 106 S.Ct. at 930–31.

We assume, without deciding, that if panorams fostered criminal activity, the City would have a substantial interest in combatting this secondary effect through a li-

censing scheme imposed on the panorams. We agree with Acorn, however, that the licensing scheme at issue here does not further any such interest because the City has failed to prove that panorams foster criminal activity on "the Block" or that they serve as the site for more criminal activity than other business establishments on "the Block."

We recognize that the district court explicitly found that the City's evidence established that the panorams "foster criminal activity," E.R. at 33, and that "the location and physical configuration of panorams distinguish them" from other businesses and pose a "clear potential for criminal use." E.R. at 35. We must uphold these findings unless "clearly erroneous." Fed.R.Civ.P. 52(a). We are bound to them unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are left with such a conviction in this case. The record yields no evidence to support the district court's broad finding that panorams foster criminal activity on "the Block." In fact, the City focused its evidence at trial on criminal activity occurring in the panorams, rather than the secondary effects of panorams on crime on "the Block."

As to the district court's finding about the uniqueness of panorams, the evidence shows that, while panorams on "the Block" may have been used for crimes such as prostitution and drug dealing before 1986, the evidence fails to show that they continue to pose a special law enforcement problem. This change in the level of criminal activity taking place inside the panoram booths can be traced to the City's adoption in 1986 of an amendment to the panoram ordinance, regulating for the first time the design and construction of the booths.

Prior to the 1986 amendment to the ordinance, the panoram booths were designed to provide maximum privacy to the customer. The booths were large enough to accommodate more than one person, and private enough to conceal any criminal activi-

ty engaged in by the people occupying the booth. Because of the configuration of the booth and the locking doors, it was difficult, if not impossible, for anyone outside the booth to monitor what was going on inside. All this changed in 1986 when the City amended the panoram ordinance to regulate the design of the booths themselves. The amended ordinance requires that the curtain or door at the entrance to the booth be cut off two feet from the bottom so that someone in the main aisle connecting the booths can determine the number of persons inside. If the booth contains a chair or any other place to sit, a large window has to be left in the door or curtain providing an unobstructed view of the interior of the booth. The booth must be sufficiently illuminated so that someone outside can determine the number of persons inside and the door to the booth cannot be locked. Finally, a sign must be prominently displayed, inside as well as outside the booth, informing customers that only one person can occupy the booth and that violators will be criminally prosecuted. SMC 6.42.110.

In sum, the panoram booths are now configured in such a fashion that anyone on the outside can determine whether more than one person is using the booth. It comes as no surprise, then, that the booths are much less attractive now than they once were to those who would use them for illegal transactions. Common sense compels this conclusion, as does the testimony of the police officers who were called by the City to testify to the amount of criminal activity currently taking place inside the panorams.

For example, the first officer who testified for the City, Sergeant Doman, conclud-ed that because the 1986 regulations made the interiors of the booths visible to those outside, "people are not willing to use the booths for [criminal] types of activities." Reporter's Transcript ("R.T.") at 26. Especially telling is the following exchange between the City's counsel and Sergeant Doman:

Q: [C]urrently, is your unit making any arrests in panoram businesses?

A: No, we are not.

Q: Is it issuing much in the way of citations?

A: No, we are not.

Q: And is there something you attribute that to?

A: [T]he new ordinance regulating the doors and the viewing ports in the doors.

R.T. at 28.

Sergeant Doman's testimony is fully corroborated by the statements of other officers responsible for panoram inspection. Officer Niemiec stated that "[law] enforcement has lessened because of the door policy, which has changed under the new ordinances." R.T. at 44. Similarly, Officer Wirth noted that the change in the door policy had "been a great help" because it "made the pan room much less attractive to a criminal conducting illegal activity." R.T. at 133. Another officer stated that he could not "recall[ ] citing anyone inside the panorams for violations" within the last "couple of years." R.T. at 118 (testimony of Officer Ash). Indeed, the district court acknowledged "the fact that the officers themselves seem to recognize a difference due to the change in ordinance." R.T. at 72.[6] In fact, not a single witness testified that criminal activity in panorams is currently great enough to warrant the costs of

---

**6.** Although some officers believed that there was some suspicious activity taking place on the panoram premises or in the booths, the activity rarely became criminal activity for which citations could be issued or arrests made.

For example, Officer Englin thought that panorams would be conducive to criminal activity "[b]ecause they're off the street and they seem—I don't know the why or the wherefore, I'm guessing because it's [sic] out of sight." R.T. at 93. Yet, since implementation of the 1986 ordinance requiring reconfiguration of the panoram booths, he had not made any arrests for

"sexual misconduct inside a panoram location." R.T. at 98. Officer Rodriguez noticed "more known prostitutes that [he] know[s] that are going into the pan rooms," R.T. at 64, and yet, since 1986, he had made only one arrest for prostitution in a panoram booth. R.T. at 62.

In these and other instances, officers expressed unsubstantiated hunches. Such testimony does not satisfy the City's burden of showing that the panorams are conducive to a heightened level of criminal activity that might justify imposing special license fees on panoram businesses.

heightened police inspection and surveillance. Thus, although the panoram booths might have been conducive to criminal activity prior to 1986 because of the privacy they afforded, the district court's finding that panorams on "the Block" currently foster criminal activity because of their current configuration or location lacks record support.

At oral argument, the City relied on a statement Officer Niemiec made during trial to the effect that criminal activity had increased as more panorams moved onto "the Block." Officer Niemiec testified that it was his observation that "criminal activity seems to gravitate towards where the pan rooms are located, for some reason." R.T. at 54. This testimony by Officer Niemiec cannot carry the day for the City. As we read his testimony, Officer Niemiec did little more than note what appeared to him to be a correlation between criminal activity in a neighborhood and the presence of panorams. The City, however, has never tried to justify the licensing scheme on the grounds that panorams attract criminals to "the Block" and the surrounding neighborhood generally.[7] Rather, the City justified the licensing scheme as necessary to cover law enforcement costs *stemming from crimes being committed on the premises of the panorams themselves.* Nothing in Officer Niemiec's testimony suggests that there is a correlation between criminal activity in the panorams and criminal activity in the surrounding neighborhood. Thus, Niemiec's testimony provides no support for the district court's finding that panorams foster criminal activity *in the general area.*

We thus conclude that the current panoram license fees violate the First Amendment under the *Renton* standard. The City has not established that the licensing scheme furthers a substantial governmental interest. Indeed, the governmental interest advanced by the City to justify the licensing fees—requiring panoram operators to pay for the harmful secondary effects of criminal activity in the panoram establishments—is not supported by the City's own evidence at trial.[8] We now turn to Acorn's challenges to the City's shareholder disclosure rule.

## II

## THE CITY'S SHAREHOLDER DISCLOSURE RULE

The Seattle panoram ordinance authorizes the Director of Licenses to issue ad-

---

**7.** Had the City attempted to make this more general "secondary effects on the community" argument, it would have had to explain why it does not impose special taxes or fees on other businesses on "the Block" for their contribution to the criminal activity taking place in the neighborhood. The City's witnesses at trial testified that other business establishments on "the Block," in particular the Marketplace Tavern, were used for criminal transactions and added to the general crime problem in the area. Even under the *Renton* test, a regulatory scheme is unconstitutional if it is too underinclusive. *See Renton,* 475 U.S. at 52, 106 S.Ct. at 931.

In spite of the problems with such an argument, and the fact that the City did not raise it, the district court, as we noted earlier, focused on the general impact panorams have on "the Block." For example, the district court identified as a relevant issue for trial "the nature and extent of the secondary effects created by panoram machines *on the areas in which they operate.*" E.R. at 8 (emphasis added). The district court went on to rule that the City "may include as a cost of regulation, police enforcement of the panoram ordinance and other ordinances

*within reasonable proximity of panoram establishments." Id.* at 10 (emphasis added).

This broader focus of the district court notwithstanding, it remains clear that the City's theory is a more narrow one relating to crime committed *on the premises of panorams.* As the City itself concedes, the evidence at trial was limited to "costs of police enforcement ... incurred *upon* panoram premises.... It did not include ... any costs of police enforcement incurred off panoram premises." Brief of Appellee at 18.

**8.** Moreover, even if the City had provided such evidence, it would still have to show, as Judge Wright points out, *see infra* p. 227, why its licensing scheme was not overinclusive in that it was directed to all panoram establishments, whether they were located on "the Block" or off "the Block," and the City never contends, and the district court never finds, that panorams located off "the Block" foster criminal activity, either on their own premises or in their surrounding area. *See Renton,* 475 U.S. at 52, 106 S.Ct. at 931 (ordinance would need to be " 'narrowly tailored' to affect only that category of [panorams] shown to produce the unwanted secondary effects").

ministrative rules to carry out and enforce the provisions of the ordinance. SMC 6.02.-050. Pursuant to this authority, the Director of Licenses promulgated Rule 6.42.-040.1, which requires any corporation applying for a panoram license to provide

[a] listing of all shareholder(s), including true names and residence addresses, of those shareholders who voted to elect current members of the Board of Directors of the Corporation: *Provided,* if any such Director received the votes of more than 51% of the shares held by shareholders, then those shareholders who voted the largest number of shares in support of the Director shall be disclosed until the total shares so disclosed equals or exceeds 51%.

\* \* \* \* \* \*

If shares in the Corporation are held by other than individuals, the ownership entities must be disclosed to the level where individual owners are identified. *Id.*[9] If a corporate applicant fails to provide this information, the licensing agency may refuse to process the application. However, the rule expressly provides that no applicant will be denied a license because of the identity of any of its shareholders. Rather, "[t]he information will be used solely to identify and notify control persons of their responsibilities under [the licensing ordinance] and *to hold such persons legally responsible should any provisions of [the ordinance] be violated.*" *Id.* (emphasis added).

Acorn argued to the district court that forced disclosure of individual shareholders' identities unconstitutionally chills the exercise of their First Amendment rights.[10] The district court summarily rejected this argument, stating that it was "not persuaded ... that limited shareholder disclosure chills or unreasonably restricts protected speech." E.R. at 13. Moreover, to the extent any speech might be chilled, the court concluded that "accountability is a

sufficiently compelling interest to justify potential burdens on protected expression." *Id.* We must disagree.

The City does not dispute that the films and live shows exhibited in panorams are forms of expression entitled to the "same degree of protection afforded speech clearly at the core of first amendment values." *Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1058 (9th Cir.1986). As the Supreme Court has recognized, forcing an association engaged in protected expression to disclose the names of its members may have a chilling effect on that expression. *Cf. Talley v. California,* 362 U.S. 60, 64, 80 S.Ct. 536, 538, 4 L.Ed.2d 559 (1960) (requiring handbills to display names of their sponsors restricts freedom to distribute information); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958) (compelled disclosure of membership lists of political advocacy group likely to have chilling effect on group's activities). This chilling effect exists even when it is not the government's intention to suppress particular expression. *NAACP v. Alabama,* 357 U.S. at 461, 78 S.Ct. at 1171. For this reason, a compelled content-neutral disclosure rule is unconstitutional unless it furthers a substantial governmental interest. *See Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1975). Further, there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* (footnotes and citations omitted). In the instant case, the City of Seattle has failed to identify a substantial governmental interest that is furthered by requiring disclosure of the identity of shareholders of corporations engaged in the panoram business.

The City asserts that requiring corporate applicants for panoram licenses to disclose the names and addresses of their shareholders "is intended to gain accountability,

---

**9.** It is difficult to discern from the language of the rule exactly when shareholder information must be disclosed to the licensing agency.

**10.** Acorn also appeals the district court's rejection of its claim that the Director of Licenses

exceeded his authority under the ordinance in promulgating the disclosure rule. We agree with the district court that this claim is without merit.

in the least intrusive manner, from the actual owners and those responsible for the control of a panoram business." Appellees' Brief at 26. In support of its claim, the City offers the deposition testimony of the Director of Licensing, describing the problems the City has historically encountered when trying to enforce the panoram ordinance because corporate officers and managers were either not properly listed on the license application or could not be located. With the shareholder disclosure rule, the City argues, it has the ability to go beyond the officers and directors to "identi[f]y ... the real 'control persons' or policy makers of panorams." Appellees' Brief at 36.

Because officers and directors, not shareholders, are legally responsible for the management of a corporation's business, we fail to see how the City's interest in accountability is served by notifying shareholders that the doors of the panoram booths be cut off two feet from the bottom or that booths be lighted. These are management, not shareholder, concerns. If panoram booths fail to comply with the ordinance, the City is free to take appropriate enforcement action against the corporation and its officers and directors. The most obvious remedy available to the City is to put the corporation out of the panoram business by revoking its city licenses. In the end, the shareholders will be held accountable in the only way they can be held accountable—through a diminution of the value of their stock. But that will happen automatically whether or not their names are disclosed to the City. In short, there is no logical connection between the City's legitimate interest in compliance with the panoram ordinance and the rule requiring disclosure of the names of shareholders.

In rejecting Acorn's First Amendment challenge to the disclosure rule, the district court sought to distinguish the Seventh Circuit decision in *Genusa v. City of Peoria,* 619 F.2d 1203 (7th Cir.1980), which struck down as unconstitutional a similar shareholder disclosure provision in an adult bookstore licensing ordinance. *Id.* at 1217. *Genusa* cannot be distinguished so easily,

however. In that case, the city of Peoria required the officers, directors and shareholders holding more than ten percent of the corporation's stock to disclose extensive background information. Although the information sought under the provision was of a more personal nature than that sought by Seattle in this case, the Seventh Circuit's analysis did not focus on the nature of the information to be disclosed. Rather, the court questioned whether there was any relevant correlation between the asserted governmental interest in obtaining the information and the information required to be disclosed. The court determined that the disclosure requirement violated the First Amendment because all the information that the city of Peoria needed for the enforcement of its adult bookstore licensing ordinance could be obtained from the corporation itself. Accordingly, the court concluded that there could be "no purpose other than harassment in requiring the individual ... stockholders to file separate statements or applications." *Id.; see also Natco Theatres, Inc. v. Ratner,* 463 F.Supp. 1124, 1132–33 (S.D.N.Y.1979). *Genusa,* therefore, fully supports our conclusion that a shareholder disclosure statute that potentially chills protected expression cannot stand if the information sought is not reasonably related to the furtherance of a legitimate and substantial governmental interest in regulating the protected activity.

In conclusion, we hold that both the license fee scheme and the shareholder disclosure requirements of the City's panoram ordinance violate the First Amendment. Accordingly, the judgment of the district court is REVERSED.

EUGENE A. WRIGHT, Circuit Judge, Specially Concurring:

Although the majority and I agree that the panoram licensing ordinance fails to meet the test of *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), I disagree with its conclusion that the district court clearly erred by finding that panorams foster criminal activity. *See FW/PBS, Inc. v. City of Dallas,* 837 F.2d 1298, 1304–05 (5th Cir.

1988) (*Renton* applied to licensing scheme), *cert. granted,* — U.S. ——, 109 S.Ct. 1309, 103 L.Ed.2d 578 (1989).

The district court analogized the city's panoram licensing ordinance to the zoning provision in *Renton,* holding that the city was attempting to control the secondary effects of panorams on the areas in which they operated.[1] It found specifically that panorams "foster criminal activity."

The majority acknowledges that it must uphold this finding unless "clearly erroneous" but concludes that:

> The record yields no evidence to support the district court's broad finding that panorams foster criminal activity on "the Block." [2]

If our review was de novo, I might agree with the majority's evaluation of the evidence. But our review is for clear error, and plenty of evidence supports the district court's finding that panorams foster criminal activity.[3]

However, I would find the ordinance unconstitutional on other grounds. *Renton* instructs us that an acceptable content-neutral time, place and manner regulation must be "designed to serve a substantial government interest and allow[ ] for reasonable alternative avenues of communication." *Tollis, Inc. v. San Bernardino County,* 827 F.2d 1329, 1332 (9th Cir.1987) (citing *Renton,* 106 S.Ct. at 930). As part of this analysis, we look to see if the ordinance is narrowly tailored, asking if there is "a logical relationship between the evil feared and the method selected to combat it." *Id.* at 1332–33 (citing *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 80, 96 S.Ct. 2440, 2457, 49 L.Ed.2d 310 (1976)).

Here, the city has presented no evidence that panorams off the Block have any

---

1. The City's evidence established that panoram rooms foster criminal activity. Even if the panorams are not the sole cause of the criminal conduct, they contribute substantially to it. Combatting this effort, preventing the use of panorams for illegal ends, is by all accounts an important and substantial government interest. Thus, the court finds that the City met its burden of proof on the first issue of fact: panorams create substantial secondary effects which the City has acted to prevent. Order at pages 4–5.

2. I disagree also with the majority's characterization of the district court's finding. It did not find that panorams fostered criminal activity "on the Block." It found only that panorams fostered criminal activity.

  I understand the district court's finding to be that panorams foster criminal activity at panoram establishments. That finding is consistent with the city's theory that panorams foster criminal activity on the premises. It is also consistent with the evidence presented. The majority acknowledges that the city "focused its evidence at trial on criminal activity occurring in the panorams, rather than the secondary effects of panorams on crime on 'the Block.'"

3. Sergeant Dorman testified that the new ordinance for booths solved some of the problems at panorams, but that the rooms themselves were still gathering places for many different types of persons, including prostitutes who used them to attempt to solicit business. Although the sergeant admitted that his unit had not made any prostitution arrests of customers *in the booths,* they had arrested persons working in the panoram establishments.

Officer Niemiec had observed acts of prostitution, persons using narcotics, and others doing lewd acts in panoram rooms. He stated that criminal activity seemed to be situated around where the pan rooms were located and that a portion of the criminal activity "on the Block" used the panoram premises. As the majority has noted, he observed also that the criminal activity seemed to gravitate toward where the pan rooms were located.

Officer Rodriguez had seen prostitutes working in the panoram room and had personally made one prostitution and one theft arrest.

When asked about the type of enforcement activity expected in the panoram room, Lieutenant Hunt testified that there was a potential for more criminal activity in the establishments.

Officer Englin had observed narcotics transactions, the transfer of stolen goods, and occasional sexual misconduct in the panoram establishments. He thought they fostered such activity because they were off the street, out of sight, and were open late at night. Although he could not remember any arrests that had been made in the panoram establishments, he had observed what he believed was criminal activity. He spent approximately three quarters of his time in the panorams and only one quarter at other locations.

Officer Ash had also observed narcotics activity in panoram rooms. When asked if his presence as a uniformed police officer had any effect on persons in the panoram establishments, he stated: "I believe our presence acts as a deterrent to any type of crime in panorams or outside on the panoram sidewalks."

Officer Wirth also stated that his presence in the panorams acted as a deterrent.

harmful secondary effects on the community. It has attempted to control the secondary effects in panoram establishments on *one block* in downtown Seattle, but the ordinance applies to panorams not on this block. These panorams contributed approximately 50% of all revenue raised from the licensing scheme.

The ordinance is unconstitutional because the city has failed to show that it was sufficiently narrowly tailored to affect only that category of panorams shown to produce the unwanted secondary effects. *See Tollis,* 827 F.2d at 1333 (citing *Renton,* 106 S.Ct. at 931).