# UNITED STATES SATELLITE BROADCASTING COMPANY, INC., Plaintiff,

v.

# Robert LYNCH, et al., Defendants.

## No. Civ. S–98–1838 WBS/DAD.

United States District Court,
E.D. California.

March 12, 1999.

---

**1116**

Stephen Woods White, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, Maria Colsey Heard, Pro Hac Vice, Leslie R Cohen, Pro Hac Vice, Bernard Nash, Pro Hac Vice, Dickstein Shapiro Morin and Oshinsky, Washington, DC, for plaintiff.

Marcia A. Fay, Attorney General's Office of the State of California, Sacramento, CA, for defendants.

### MEMORANDUM AND ORDER

SHUBB, Chief Judge.

This 42 U.S.C. § 1983 action for declaratory and injunctive relief challenges "the Boxing Act," a California law that imposes a five percent gross receipts tax on all pay-per-view telecasts of boxing, wrestling, kickboxing, and similar contests. *See* Cal.B. & P.Code § 18600. Plaintiff refused to pay the tax following its telecast of the Holyfield versus Tyson boxing match of June, 28, 1997, and brought this action to declare the tax unconstitutional under the First and Fourteenth Amendments and to enjoin its enforcement. Defendants, members of the State Athletic Commission ("the Commission") responsible for collecting and enforcing the tax, move for dismissal for lack of subject matter jurisdiction and for failure to state a claim, and also move for summary judgment. Fed.R.Civ.P. 12(b)(1), (6); 56. Plaintiff also moves for summary judgment.

The material facts are straightforward and undisputed. Plaintiff broadcasts programming to its subscribers by satellite. This programming includes pay-per-view telecasts of boxing, martial arts, and wrestling events. The Boxing Act requires broadcasters of such telecasts viewed in California to pay to the Commission a five percent tax on their gross receipts. *See* Cal.B. & P.Code §§ 18600, 18625, 18832.[1] The Commission deposits the revenues in the state general fund.

On June 28, 1997, plaintiff sold pay-per-view telecasts of a live boxing contest held in Nevada between Evander Holyfield and Mike Tyson. Plaintiff sold these telecasts to subscribers in California. Defendants demanded payment of the tax required by section 18832. Plaintiff refused to pay the tax, and inquired whether a procedure existed by which it could pay the tax and then seek a refund. Defendants have not responded to this inquiry. Plaintiff has scheduled future pay-per-view telecasts of contests covered by Section 18832 which it plans to sell to subscribers in California.

■ Defendants' motion to dismiss for lack of jurisdiction under Rule 12(b)(1) is based upon the Eleventh Amendment and the Tax Injunction Act. The court will examine each argument in turn.

■ The Eleventh Amendment to the United States Constitution states that,

[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

---

1. "Every person who charges and receives a fee for exhibiting a simultaneous telecast of any live, current, or spontaneous contest or wrestling exhibition on a closed-circuit telecast viewed within this state shall ... pay to the commission a 5 percent tax, exclusive of federal taxes thereon, of the amount paid for admission or subscription telecast, as defined in Section 18830, to the showing or viewing of the contest or wrestling exhibition." Cal.B. & P.Code § 18832.

"Contest and match are synonymous, may be used interchangeably, and include boxing, kickboxing, martial arts exhibitions, and mean a fight, prize-fight, boxing contest, pugilistic contest, kickboxing contest, martial arts contest, between two or more persons, where full or partial contact is used or intended which may result or intended [sic], to result in physical harm to the opponent." *Id.* at § 18625.

prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Though styled as an "immunity," the Eleventh Amendment limits the subject-matter jurisdiction of the federal courts. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 53, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). It applies to suits arising under either federal or state law, and to those brought in diversity. *See id.* 116 S.Ct. at 1122; *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *see also Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (Eleventh Amendment immunity extends to suits brought against a state by its own citizens).[2]

■■ Under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, "[t]he Eleventh Amendment does not bar federal court actions against state officials to enjoin them from enforcing unconstitutional statutes." *Capitol Industries–EMI, Inc. v. Bennett,* 681 F.2d 1107, 1120 (9th Cir. 1982). While merely characterizing relief as "equitable" does not license a suit that would operate as a money judgment against the state, *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), or a quieting of title against state interests, *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), the *Ex Parte Young* doctrine does not require an injunction to be "totally without effect on the State's revenues." *Edelman,* 415 U.S. at 667, 94 S.Ct. 1347.

Defendants argue that because plaintiff seeks to enjoin the Commission from enforcing a tax obligation which plaintiff has already incurred under California law, plaintiff's lawsuit does not seek "prospective" injunctive relief within the meaning of the *Ex parte Young* exception. In *Capitol Industries–EMI,* the Ninth Circuit permitted a suit to enjoin the California Franchise Tax Board from collecting seven years worth of back taxes. The court rejected Eleventh Amendment immunity, finding that the case fell "squarely within the doctrine of *Ex Parte Young.*" *Capitol Industries–EMI,* 681 F.2d at 1120. "In such cases, the Eleventh Amendment does not preclude access to the federal courts." *Id.* On the issue of Eleventh Amendment immunity, this case cannot be distinguished from *Capitol Industries–EMI.* Accordingly, the Eleventh Amendment does not bar the instant suit.[3]

■■ The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." 28 U.S.C. § 1341. When they apply, these simple words constitute a "broad jurisdictional barrier" to either declaratory or injunctive actions against a state taxation scheme. *Arkansas v. Farm Credit Services of Cent. Arkansas,* 520 U.S. 821, 117 S.Ct. 1776, 1779, 138 L.Ed.2d 34 (1997).

■ In order for the Tax Injunction Act to preclude jurisdiction, the state must offer the taxpayer a "plain, speedy and efficient" means of challenging or recovering the tax. 28 U.S.C. § 1341. "Succinctly put, the state remedy is 'plain' as long as the remedy is not uncertain or unclear from the outset; 'speedy' if it does not entail a significantly greater delay than a corresponding federal procedure; and 'efficient' if the pursuit of it does not generate ineffectual activity or unnecessary expenditures of time or energy." *U.S. West, Inc. v. Nelson,* 146 F.3d 718, 725 (9th Cir.1998) (interpreting identical exception to 28 U.S.C. § 1342 (public utility rate-

---

**2.** Section 1983 does not contain an abrogation of Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

**3.** Moreover, defendants do not contest that plaintiff seeks "prospective" relief, even under their definition, in that plaintiff has scheduled future broadcasts of events covered by the Boxing Act tax.

payer suits), and citing *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 517–521, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981) (Tax Injunction Act case)). A scheme whereby a taxpayer pays the tax under protest and then appeals to the state for a refund constitutes a "plain, speedy and efficient remedy." *Jerron West v. California State Bd. of Equalization*, 129 F.3d 1334, 1338 (9th Cir.1997). Thus, the availability to plaintiff of a remedy under California law will determine the applicability of the Tax Injunction Act.

■■■ California, however, has its own jurisdictional bar against challenging the assessment of a tax.

> No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such a manner as may be provided by the Legislature.

Cal. Const. art. xiii, § 32 ("Section 32"). Section 32 both bars all actions for declaratory or injunctive relief from a tax, and gives the legislature exclusive control of whether and under what conditions a taxpayer may recover a tax paid under protest. *Woosley v. California*, 3 Cal.4th 758, 789, 13 Cal.Rptr.2d 30, 838 P.2d 758 (1992).

In light of Section 32, the court cannot find a "plain" cause of action or procedure by which this tax, if paid, might be recovered under California law. The court looks first to the Boxing Act itself. That law contains no express scheme for the refunding or challenging of an illegal or erroneous tax. *See* Cal.B. & P.Code §§ 18600 *et seq.* In this sense, the Boxing Act differs from the statutory scheme for the recovery of taxes collected by the Board of Equalization. *See* Cal.Rev. & Tax Code §§ 6901, 6902, 6932; *see also Jerron West*, 129 F.3d at 1338 (Board of Equalization procedures constitute a " 'plain, speedy and efficient' remedy under the [Tax Injunction] Act").

The court looks next to Cal.B. & P.Code § 158, which defendants claim creates a procedure for recovering the tax. Section 158, however, applies to "application fees, license fees or penalties" collected by the Department of Consumer Affairs or its Director. *See* Cal.B. & P.Code §§ 100–471 (Department of Consumer Affairs). The Boxing Act tax is collected by the State Athletic Commission and thus, by its very terms, § 158 does not apply.

Finally, the court looks to Cal.Gov.Code § 13143, which provides that in general:

> [w]henever any law which provides for fees or payments to a state agency does not authorize, as provided in this article, the refund of erroneous or excessive payments thereof, refunds may be made by the state agency which collected the fee or payment of any or all amounts received . . .

Cal.Gov.Code § 13143 (emphasis supplied). Defendants argue that in light of *Woosley v. California*, which did not concern Cal. Gov.Code § 13143, the court should "imply" a cause of action for plaintiff under that section, despite the strong language of Section 32 to the contrary. Defendants argue that § 13143 is similar to the Code sections at issue in *Woosley*. Defendants' arguments have no merit.

*Woosley* involved a lawsuit to recover vehicle license fees and sales and use taxes collected under the Revenue Code and the Vehicle Code. Express refund procedures exist for both kinds of payments. With regard to the license fee, the Revenue Code provides:

> [w]henever the department of [of motor vehicles] erroneously collects any license fee . . . the amount shall be refunded to the person paying it upon application therefor made within three years after the date of the payment.

Cal.Rev.Code § 10901. With respect to use taxes, the Revenue Code provides that erroneously paid taxes "shall be refunded" by the Board of Equalization. Cal.Rev. Code § 6901. If the Board of Equalization rejects the taxpayer's statutorily authorized claim, the taxpayer may bring an

action against the Board in a court of law. Cal.Rev.Code §§ 6933–6934.

Even a cursory comparison of these statutes contradicts defendants' reading. Sections 13140–13144 of the Government Code authorize agencies to make refunds, limit the circumstances under which they may do so, and include intra-governmental provisions for specifying where the money will come from. Sections 6933–6934 and 10901 state that erroneous fees "shall be refunded," and spell out procedures by which a taxpayer may proceed first before the agency and then, if unsuccessful, in a court of law. No comparable procedures are provided here.

Moreover, the analysis of the California Supreme Court in *Woosley* indicates that, in a case such as this, all doubts must be resolved against the implication of a tax-payer claim. *Woosley* raised two issues regarding Section 32. The taxpayers argued that class claimants who had paid the license fee, but who had not made a claim against the Department of Motor Vehicles or signed their consent to the lawsuit, could still be made part of the class action with regard to license fees. In the case of use taxes, the *Woosley* court also had to determine whether the legislature had authorized class claims at all.

The California Supreme Court resolved both questions against the taxpayers, over-turning a number of lower appellate court cases to the contrary and despite the general authorization of class claims against the state under Cal.Gov.Code § 910. The court held that tax refunds are different from other kinds of claims. *Woosley*, 3 Cal.4th at 789, 13 Cal.Rptr.2d 30, 838 P.2d 758. "The California Constitution express-ly provides that actions for refunds must be brought in the manner prescribed by the Legislature." *Id.* "This constitutional limitation rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues." *Id.*

■ Thus, contrary to defendants' position, *Woosley*, if anything, indicates that Section 32 does not permit a court to interpret a provision of California law to "imply" a cause of action for refund of the Boxing Act tax. In light of Section 32, defendants' proposed reading of California law is untenable; moreover, the mere hypothetical possibility of a cause of action does not constitute the "plain" remedy required by the Tax Injunction Act. *See U.S. West*, 146 F.3d at 725 ("the state remedy is 'plain' as long as the remedy is not uncertain or unclear from the outset").

■ If plaintiff could maintain its § 1983 action in California state court, that would satisfy the requirements of the Tax Injunction Act. *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 117, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (ability to pursue § 1983 claim in state court constitutes adequate remedy); *see Brown v. Pitchess*, 13 Cal.3d 518, 119 Cal.Rptr. 204, 531 P.2d 772 (1975) (California courts can hear federal claims); *Martinez v. California*, 444 U.S. 277, n. 7, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Even if such an action were authorized, however, Section 32 would bar a California court from hearing plaintiff's claim for injunctive relief. Moreover, § 1983 does not even authorize a suit for damages against a state or against a state official in his official capacity.[4] *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Plaintiff thus could not maintain a § 1983 action for refund of the tax in state court.[5] In fact, it

---

4. Moreover, defendants point to no statute authorizing the California courts to hear federal claims for state-tax refunds, nor to any case law construing Section 32 to permit them.

5. This finding also comports with the decision of the Ninth Circuit in *Direct Marketing Ass'n,*

*Inc. v. Bennett*, 916 F.2d 1451 (9th Cir.1990). There, the Court of Appeals considered a federal constitutional challenge to a California tax. Though it did not explicitly address the issue, the court in holding that the Tax Injunction Act did not bar jurisdiction necessarily ruled that the plaintiff did not have a

appears plaintiff has challenged the tax by the only means available to it. Defendants' motion to dismiss must be denied, and the court proceeds to consider the cross-motions for summary judgment.

■ The Boxing Act Tax imposes a five percent gross receipts tax exclusively on telecasts of boxing, martial arts, and wrestling events, as well as on telecasts of other combative contests. "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. New York Crime Victims Board,* 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); *Leathers v. Medlock,* 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) ("[f]or reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech").[6] In *Arkansas Writers' Project v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), the Court held invalid a statutory scheme that exempted from a general sales tax only those journals with a generally religious, sports, professional, or trade-oriented content. "[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press." *Arkansas Writers' Project, Inc.,* 481 U.S. at 230, 107 S.Ct. 1722.

■ On its face, the Boxing Act taxes some telecasts, and not others, based on the content of those telecasts. Television broadcasts constitute speech. *See, e.g., Leathers,* 499 U.S. at 444, 111 S.Ct. 1438; *Schad v. Borough of Mount Ephraim,* 452

U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). The Boxing Act thus taxes some speech based solely on its content. Under *Leathers, Arkansas Writers' Project,* and the weight of First Amendment jurisprudence, the tax should be immediately subjected to strict scrutiny. Defendants, however, contend that because the Free Speech Clause does not protect the act of boxing or combat itself, it similarly does not protect boxing telecasts of such activities.[7]

■ As a threshold matter, defendants have not convinced the court that First Amendment protection does not attach to a live boxing match organized, held, and televised for the purpose of entertaining live and remote viewers. The First Amendment protects entertainment. *Schad,* 452 U.S. at 65, 101 S.Ct. 2176. It protects live entertainment, including even the expressive content of nude dancing. *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Under *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a general law that impacts conduct with expressive and non-expressive elements must be "within the constitutional power of the government," and in furtherance of "an important or substantial governmental interest [that] is unrelated to the suppression of free expression." *O'Brien,* 391 U.S. at 376–377, 88 S.Ct. 1673; *see Barnes,* 501 U.S. at 572, 582, 111 S.Ct. 2456 (plurality). The law may be upheld only if its "incidental restriction on alleged First Amendment Freedoms is no greater than is essential to the furtherance of that interest." *Id.* 391 U.S. at 377, 88 S.Ct. 1673.

sufficiently plain, speedy, and efficient section 1983 remedy in state court.

**6.** In *Leathers,* the Court considered an exemption for print media from a general sales tax. The Court found the exemption to be constitutional, even though the sales tax applied to other forms of expression, such as cable television, as well as sales of non-expressive goods. The instant case involves a tax based on content, and hence differs fundamentally from the facts of *Leathers.*

**7.** Defendants do not contend that the instant telecasts fall into any of the categories of speech which receive a special analysis under the First Amendment, such as obscenity, defamation, immediate incitement to lawless action, or speech calculated and likely to bring about imminent harm the state has the substantive power to prevent. *See e.g., Simon & Schuster,* 502 U.S. at 124, 112 S.Ct. 501 (Kennedy, J., concurring) (summarizing special categories).

The court need not even reach the *O'Brien* analysis, however, because this suit does not merely involve the application of a general law, such as a ban on public nudity, on the burning of draft cards, or on physical combat, to conduct with both expressive and non-expressive elements. *Cf. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (public nudity); *U.S. v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (draft cards). Moreover, plaintiff is not a boxer or boxing promoter; plaintiff sells entertainment, the moving images and sound recorded at boxing and other combative contests.[8]

▮ Thus, it simply does not matter in the instant case whether the First Amendment protects or even applies to boxing. A tax on the dissemination of entertainment based on content must pass strict scrutiny, regardless of its subject matter. *Simon & Schuster*, 502 U.S. at 115, 112 S.Ct. 501; *Arkansas Writers' Project*, 481 U.S. at 230, 107 S.Ct. 1722. The First Amendment does not protect murder, yet the court feels confident that news broadcasts of murder, killing, or war may not be censored to suppress their content. Nor is a hurricane protected by the First Amendment; yet a broadcaster with an audience has a right under the First Amendment to broadcast images of a hurricane. Defendants' argument, that telecasts of boxing do not enjoy First Amendment protection because boxing is somehow "less valuable" than other subjects, runs contrary to every principle of the Free Speech Clause itself.

This question has arisen before. In *Simon & Schuster*, for instance, the Supreme Court considered New York's "Son of Sam" law. That law required that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account for distribution to the victims of the crime. *Id.* at 108, 112

S.Ct. 501. The First Amendment certainly does not protect participation in crime, yet the Court in overturning the Son of Sam law held that the Free Speech Clause did protect the real-life, first-person description of criminal activities by a convicted felon. *Id.* at 116–118, 112 S.Ct. 501. Like the Son of Sam law, the Boxing Act tax "singles out income derived from expressive activity for a burden the state places on no other income," by creating "a financial disincentive" to broadcast telecasts with a particular content. *Id.* at 116–118, 112 S.Ct. 501. Like the Son of Sam law, the Boxing Act therefore violates the First Amendment unless it passes strict scrutiny.

▮ Because the undisputed facts establish that the Boxing Act tax must survive strict scrutiny, defendants would at trial bear the burden of proving the tax to be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Id.* at 118, 112 S.Ct. 501. To resist plaintiff's motion for summary judgment, they must therefore offer specific facts from which a rational trier of fact could so conclude. Fed.R.Civ.P. 56.

▮ Defendants argue that the state has a general interest in raising revenue. While this interest has been described as "critical" and "important," as a matter of law it does not justify a content-based tax on speech. *Arkansas Writers' Project*, 481 U.S. at 231–232, 107 S.Ct. 1722 ("an alternative means of achieving the same interest [raising revenue] without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally"), quoting *Minneapolis Star & Tribune v. Minn. Com'r of Rev.*, 460 U.S. 575, 586, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

8. Plaintiff has submitted a videotape recording of the Holyfield versus Tyson fight of June 28, 1997. This recording includes roughly 2.5 hours of commentary and undercard matches which preceded the Tyson versus Holyfield bout. The broadcast includes not only images from multiple cameras arranged with the goal of providing maximum entertainment to the viewer, but also includes interviews, narrated documentary, and blow-by-blow commentary on the fight itself.

Next, defendants contend that the Boxing Act tax defrays the cost of running the State Athletic Commission, and assert that the tax assists the Commission "in its efforts to keep boxing clean." [9] While speech may be taxed to help pay for the costs created by the speech itself, such as in the case of parades, *Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), *Murdock v. Pennsylvania*, 319 U.S. 105, 113–114, 63 S.Ct. 870, 87 L.Ed. 1292 (1943),[10] the state may not merely use supposed "administrative costs" as a guise for raising revenue. *See, e.g., Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1205 (11th Cir.1991). Defendants, who as State Athletic Commissioners are presumably in a position to know, present no evidence or argument whatsoever on the amount of the costs, if any, incurred to the Commission by plaintiff's telecasts into private homes of boxing matches which occur in another state. Defendants do not even suggest how much money they spend every year to "keep boxing clean." Thus, even if the court could conclude that defendants have raised compelling interests, which it cannot, the court cannot conclude that the Boxing Act tax has been narrowly tailored to serve them.

Defendants quite simply present no evidence whatsoever that the amount of the Boxing Act tax bears any relationship to anything. Defendants present no evidence on the amount of revenues created, on the current "costs" of the State Athletic Commission (in 1965 the budget of the Commission amounted to around $20,000) as related to boxing telecasts, or on the cost to the state, if any, of plaintiff's speech. Clearly, the Commission does not directly spend all of the revenues raised by the Boxing Act tax, because it deposits those revenues in the state general fund.

Finally, defendants suggest that the tax must be imposed to "equalize [the] tax burden between live shows, closed-circuit telecasts, and non-closed circuit broadcasts and telecasts." [11] The state collects numerous licensing fees from persons who wish to box in California, as well as from those who wish to train, promote, manage, or referee boxers in California. Cal.B. & P.Code §§ 18802–18822. The state also collects a five percent tax on all tickets sold for live boxing events held in California, as well as on all sales of broadcast or television rights with respect to such contests. Cal.B. & P.Code § 18824. Section 18832, the statute at issue, imposes a five percent tax on all closed-circuit telecasts, regardless of the initial location of the event. It thus imposes an "equal" tax burden, at least superficially, in that the percentage of tax is five percent in all cases.

Defendants, however, do not explain why the state has a compelling interest in imposing an "equal" tax on plaintiff's speech. The fact that a tax is imposed on tickets sold to live boxing events held in California does not automatically justify an extension of that tax to satellite broadcasts of boxing events held in or out of California. Defendants similarly do not explain why the principle of "equalization" could not be served, and indeed would not be better served, by an overall taxation scheme which made no reference to the content of the speech to be taxed. Though defendants at oral argument contended that the Boxing Act tax prevents boxing promoters from evading the live-events tax

---

9. Defendants draw this language from a letter written in 1965 in support of the original version of the Boxing Act tax, and do not explain what it means. At that time, by way of reference, cable television and personal satellite broadcasts did not exist.

10. *See also Acorn Investments, Inc. v. City of Seattle*, 887 F.2d 219, 222 (9th Cir.1989) (assuming, without deciding, that tax on opera-

tors of pornographic "panoram" establishments could be justified *under City of Renton v. Playtime Theatres*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), by need to defray costs of policing secondary criminal effects).

11. Defendants offer no argument on this point, they merely quote the same 1965 letter, again without explanation.

Defendants appear to argue that taxes must be "equalized" in order to avoid disadvantaging promoters of live matches in California.[12] Even assuming that such an interest would be compelling, defendants present no evidence that the tax has this effect, or that live events and satellite broadcasts compete for sales, or that live promoters somehow benefit from a tax on rights which they themselves sell for a profit. Moreover, this objective could be accomplished through a tax structure that made no reference to the content of the telecast. *See also Arkansas Writers' Project,* 481 U.S. at 232, 107 S.Ct. 1722 ("[w]hile this state interest [fostering communication in the state] might support a blanket exemption of the press from the sales tax, it cannot justify selective taxation of certain publishers").[13] Defendants have failed to bring forward any evidence suggesting that the Boxing Act tax is necessary to advance a compelling interest and narrowly tailored to achieve that goal.

Defendants' selective application of the proffered rationales to boxing telecasts and boxing telecasts alone constitutes exactly the kind of judgment about content which the First Amendment does not allow California to make. The Boxing Act tax, without constitutionally adequate justification, singles out certain speech for special treatment based on the content of that speech. The Boxing Act tax on its face therefore violates the First and Fourteenth Amendments to the United States Constitution, and the court will enjoin its enforcement against this plaintiff.

12. Defendants quote the 1965 letter to argue that California needs the tax to "encourage live shows in conjunction with closed-circuit telecasts."

13. In *Arkansas Writers' Project,* the Court found that the content-based classification did not serve the interest of promoting "fledgling journals" because it taxed fledgling journals of general interest and exempted powerful

IT IS THEREFORE ORDERED that defendants' motions to dismiss and for summary judgment be, and the same hereby are, DENIED.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment be, and the same hereby is, GRANTED. Defendants are hereby ENJOINED from enforcing California Business and Professions Code Section 18832 against the plaintiff.

religious, sports, trade, and professional journals. In this case, California has gone even further than the tax at issue in *Arkansas Writers' Project,* which involved a content-specific tax exemption from a general tax on expressive and non-expressive goods. Here, California has singled out a single type of expression on a single subject for a special tax borne by no other good.