IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Parental Rights to | No. 85601-4-I (Consolidated with Nos. 85602-2-I, 85603-1-I, 85630-8-I, 85631-6-I, and 85632-4-I) |
|---|---|
| A.R.L. | DIVISION ONE |
| | UNPUBLISHED OPINION |

SMITH, C.J. — After a dependency of more than five years, the trial court terminated the parental rights of the parents to three minor children. The mother contends that the Department of Children, Youth and Families (the Department) did not meet its statutory burden to terminate her parental rights because it failed to offer or provide her with anger management treatment, a necessary service. The father argues that he was deprived of his right to due process because the Department failed to provide adequate notice that his lack of accountability for his conduct towards A.L. was a parental deficiency which could be the basis for terminating his parental rights. We affirm.

FACTS

A.L.G. is the mother of three children at issue in this case, A.L., L.G., and S.G. A.L.G.'s spouse, R.G., is the father of L.G. and S.G.[1] In addition to L.G. and S.G., the father has 11 other children, none of whom currently live with him.

_____

[1] The court terminated the parental rights of A.L's biological father in 2020, and he is not a party to this appeal.

The father also has several prior convictions for crimes involving domestic violence and has been subject to almost 30 no-contact or protection orders in Washington.

A.L., L.G., and S.G. have two older half-siblings (not related to R.G.) who were removed from the mother's care in 2009 based on findings of physical abuse and neglect. The mother relinquished her parental rights to both children in 2011 and pleaded guilty to a charge of assault as to one of the children. A.L., born in 2010, was previously declared dependent as to the mother and removed from her care based on the mother's abuse and neglect of A.L.'s siblings. The court dismissed the prior dependency involving A.L. in 2013, when A.L. was almost three years old.

In 2018, the father was not officially living at the mother's residence, but spent "most of the time" there. The Department took all three children into protective custody in January 2018, when they were seven, four, and two years old, respectively. On January 23, 2018, A.L. reported to school staff that she had been beaten with a belt by her stepfather and kicked in the stomach and the hand by her mother. A.L.'s index finger was "very swollen" and the adjacent fingers were bruised and the school nurse observed cuts, bruising, and welts all over her body. According to school staff, A.L. routinely came to school hungry and inappropriately dressed.

Police officers observed dried blood splattered throughout A.L'.s bedroom. And A.L.'s bedroom was stripped of all items, including a bed and bedding. The mother reported, and the father confirmed, that the father "whooped" A.L. with a

belt two days earlier. There was no evidence that L.G. and S.G. had been physically abused, but because the younger children were present in the home during the abuse of A.L., they were also taken into custody.

A subsequent and more extensive medical examination revealed that A.L. had an "extraordinary" number of "inflicted injuries" in "various stages of healing" on her body. Many healed and scabbed scars were six to eight inches in length. The evidence indicated that A.L was "beaten hard" with objects over a period of time.

The examination also indicated that A.L. was "markedly growth restricted" as a result of past malnourishment. This was consistent with A.L.'s report of being deprived of food and water and certain unusual behaviors she displayed. A.L. was also determined to be anemic, which the examining physicians attributed to blood loss caused by physical abuse sustained over time. An expert in pediatrics and child abuse concluded that A.L. had experienced severe physical abuse, severe physical and psychological maltreatment, and multidimensional medical neglect and characterized these components as consistent with "torture."

The mother later pleaded guilty to assault in the third degree, designated as a crime of domestic violence, and specifically admitted that during a three-year period, she punched and kicked A.L., resulting in bruising that lasted for days. As a part of her plea, the mother also admitted that she witnessed her romantic partner beat A.L. with a belt, breaking the skin, and causing the child to vomit in pain. The mother pleaded guilty to an additional offense of criminal

3

mistreatment in the third degree, admitting that, during the same period, she withheld from A.L. access to food, water, and medically necessary healthcare. The father also pleaded guilty to offenses involving A.L.: felony assault of a child in the third degree and criminal mistreatment in the third degree, both designated as crimes of domestic violence. The father admitted that he caused bodily harm to A.L. with a belt, that was used for "disciplinary purposes." And he admitted to withholding "basic necessities of life" from A.L., including "food and needed healthcare."

The court entered an agreed dependency order as to each parent in March 2018 finding that the three children had no parent, guardian, or custodian capable of adequately caring for them under RCW 13.34.030(6)(c). The dispositional order as to the mother required her to assist with establishing paternity as to A.L.; obtain a psychological evaluation with a parenting component and follow any treatment recommendations; and obtain a domestic violence assessment and follow through with any recommended treatment. The dispositional order as to the father likewise required that he obtain a psychological evaluation with a parenting component and follow any treatment recommendations and obtain a domestic violence assessment and follow treatment recommendations.

Dr. Benjamin Johnson performed a psychological evaluation of the mother and recommended that she engage with a mental health professional and a parent coach. The mother participated in mental health therapy sporadically for a period of time and successfully completed a domestic violence treatment

program in March 2020. The mother also participated in the Triple P parenting program and a series of parenting coaches attempted to work with the mother.

The father initially declined to engage in services, citing the advice of counsel representing him in the criminal matter. In October 2021, when he was in custody, the father told the assigned social worker that he wished to engage in services but the Department was unable to find providers who could work with him while incarcerated. After his release from custody in February 2022, the father began to engage in all court-ordered services.

Meanwhile, the Department petitioned to terminate the parental rights of both parents. The petition described the evidence of physical abuse and deprivation that led the Department to take the children into protective custody. The petition asserted that in the period of over two years following entry of the dependency and dispositional orders, the parents "failed to substantially improve their parental deficiencies," and service providers indicated a "poor prognosis" for the children's safety given the parents' "lack of recognition that their long term physical and emotional abuse of their child caused extraordinary trauma."

By the time of the May 2023 fact-finding hearing, the mother had completed some court-ordered services, but was unable to demonstrate progress in addressing her parental deficiencies. The court noted that the mother had the benefit of services in prior dependencies, which had not prevented her abuse of A.L. The mother had no relationship with A.L. and, because of a no-contact order entered in the criminal matter, had not seen her since she was taken into

5

protective custody more than five years earlier.[2]  The mother initially visited regularly with L.G. and S.G., but by 2021, the mother's erratic behavior became increasingly stressful for the children and visits were suspended so that mother could reengage with a parenting coach.  At the time of the fact-finding hearing, the mother had not seen L.G. and S.G. in more than 18 months.  The father consistently visited with L.G. and S.G. after his release from custody in 2022, but as of May 2023, he had "not completed any service offered to remedy his parental deficiencies."

The hearing took place over six days. Both the mother and father appeared intermittently by Zoom.[3]  The court considered over 100 exhibits and the testimony of 13 witnesses, including the mother, who appeared in person during closing arguments and was granted leave to reopen her case to present her own testimony.  The court entered findings of fact and conclusions of law and an order terminating the mother's parental relationship to all three children and the father's parental relationship to L.G. and S.G.

Both parents appeal.

<u>Standard of Review</u>

"Parents have a fundamental liberty interest in the care and welfare of their minor children."  <u>In re Dependency of Schermer</u>, 161 Wn.2d 927, 941, 169 P.3d 452 (2007).  To terminate the parent-child relationship, the State must

---

[2]  The father was also prohibited from having any contact with A.L. by a no-contact order that would not expire for 99 years.

[3]  Zoom is a cloud-based videoconferencing software platform.

satisfy two statutory prongs. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). First, the State must establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). Evidence is clear, cogent, and convincing if it established the ultimate fact in issue as " 'highly probable.' " In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Second, the State must show by a preponderance of the evidence that termination serves the best interests of the child. RCW 13.34.190(1)(b); In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "Whether a termination is in the best interests of a child must be determined based upon the facts of each case." In re Dependency of A.M., 106 Wn. App. 123, 131, 22 P.3d 828 (2001). We give significant weight to a trial court's determination of what serves the child's best interests. In re Welfare of L.N.B.-L., 157 Wn. App. 215, 255, 237 P.3d 944 (2010).

Where the trial court has evaluated the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (citing World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of

7

the degree of proof required." P.D., 58 Wn. App. at 25. In determining whether substantial evidence supports the trial court's findings, "this court does not weigh the evidence or the credibility of witnesses." In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

Necessary Services under RCW 13.34.180(1)(d)

We first address the mother's appeal. The mother challenges the trial court's finding that the Department satisfied its burden of proof as to statutory element (d) which provides that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d).

It is undisputed that neither the dispositional order, nor any other court order, directly or impliedly, required the mother to participate in anger management treatment. Yet, the mother claims that anger management treatment was a necessary service because her anger issues were a "significant parental deficiency." It is true that even when a service is not court-ordered, it may still be considered a necessary service that the Department should have brought to the attention of the trial court prior to termination. RCW 13.34.180(1)(d); In re Dependency of T.L.G., 126 Wn. App. 181, 200, 108 P.3d 156 (2005). A necessary service is one that is " 'needed to address a condition that precludes reunification of the parent and child.' " In re Parental Rights to

8

K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

The record here does not support the mother's claim that anger management treatment was a necessary service. Dr. Johnson's evaluation of the mother did not identify uncontrolled anger as a parental deficiency or conclude that anger management treatment was appropriate. Dr. Johnson determined that the mother suffered from depression and exhibited elements of several personality disorders. To address these issues, Dr. Johnson recommended "long-term treatment with a therapist" and engagement with a parenting coach. The mother points to no professional or treatment provider who assessed her or interacted with her in the course of the dependency who recommended anger management treatment.

The mother relies on testimony in the record showing that she expressed anger and frustration at certain points during the dependency and had conflicts with some of Department employees involved in the case. The mother also points to evidence that some of Dr. Johnson's testing suggested that the mother has impulsive tendencies. And she refers to another professional's opinion that the mother could benefit from counseling to address the "underlying root of her anger." None of this testimony establishes that anger management treatment was needed to remedy a condition that precluded reunification. Instead, the testimony reflects that the Department recognized that mental health treatment was a necessary service for the mother to address a variety of issues, including emotional regulation, and encouraged her to engage in that service.

The mother also cites the testimony of Dr. Tatyana Shepel, the clinical neuropsychologist who evaluated the father and recommended that he engage in both anger management and domestic violence treatment.[4]  But again, Dr. Shepel's description of the objectives of anger management treatment does not establish that such treatment was necessary for the mother or that it was the *only* effective treatment to address issues with anger and emotional regulation.  It also appears that Dr. Shepel's recommendations for the father were affected by the father's open resistance to mental health therapy, outside of grief therapy.

The mother fails to explain why anger management treatment was a necessary service to remediate her repeated child abuse and untreated mental health which precluded reunification, considering that she abused A.L. despite having participated in anger management treatment in the past.  Furthermore, there is no evidence to suggest that any available service was capable of correcting the mother's parental deficiencies within the children's foreseeable future, especially since that the mother had no relationship with A.L and had not seen the younger children in 18 months.  See RCW 13.24.180(e) (requiring Department to prove there is "little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.")  The foreseeable future was 1 to 2 months for A.L. and 2 to 4 weeks for the younger children.[5]

---

[4] Despite Dr. Shepel's recommendation, the anger management treatment provider who assessed the father concluded that the year-long domestic violence treatment program was sufficient to address the father's anger issues.

[5] Contrary to the mother's argument, the trial court made a finding with regard to the children's foreseeable future.

In sum, the Department was not required to offer or provide anger management treatment to the mother in order to meet its burden under RCW 13.34.180(1)(d).

### Notice of Parental Deficiency

Turning to the father's appeal, he argues that the trial court violated his right to due process when it terminated his parental rights due to a "lack of accountability" without notice that failure to accept responsibility for his conduct toward A.L. could result in termination. We disagree.

"The due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and companionship of her children," which "cannot be abridged without due process of law." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). Due process requires, at a minimum, that parents have notice, an opportunity to be heard, and the right to be represented by counsel. Key, 119 Wn.2d at 611. We review de novo an alleged deprivation of due process. In re Welfare of A.G., 160 Wn. App. 841, 844, 248 P.3d 611 (2011).

In the context of a termination proceeding, due process requires that parents have "notice of the specific issues to be considered" in order "to prevent surprise, helplessness and disadvantage." A.M.M., 182 Wn. App. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Both sides "need to know what deficiencies are at issue since the State has to prove the deficiencies to make its case while the parent has to know what allegations to defend against." In re Welfare of F.M.O., 194 Wn. App. 226, 232, 374 P.3d 273

(2016). Due process is violated if a parent is held accountable for a parenting deficiency about which he or she was never notified. A.M.M., 182 Wn. App. at 790.

The father relies on A.M.M. and F.M.O. In A.M.M., the Department, seeking to terminate the mother's rights, asserted that she was unfit to parent because "she lacked understanding of her children's developmental needs." 182 Wn. App. at 784. The trial court agreed and terminated the mother's parental rights based on three deficiencies, including the "lack of knowledge regarding her children's developmental needs." A.M.M., 182 Wn. App. at 792.

This court reversed, concluding that the mother's due process rights were violated because neither the termination petition nor the dependency petition stated that the mother's lack of knowledge regarding her children's developmental needs amounted to a parental deficiency. A.M.M., 182 Wn. App. at 792-93. Rather, the petitions had focused on the mother's substance use. While the services provided to the mother included age-appropriate parenting classes, there was no evidence that she was informed that she could lose her parental rights if she did not adequately familiarize herself with her children's developmental needs. A.M.M., 182 Wn. App. at 792.

In F.M.O., the Department took custody of an infant who tested positive for drugs at birth and initiated dependency proceedings, alleging that the mother had parental deficiencies of substance abuse, mental health issues, and a history of domestic violence. 194 Wn. App. at 227. In terminating the mother's parental

rights, the court cited the mother's recurring incarceration as an additional basis supporting the termination.  F.M.O., 194 Wn. App. at 229.

On appeal, Division Three rejected the mother's claim that parental deficiencies are limited to those expressly identified in the termination or dependency petition.  The court nevertheless concluded there was nothing in the record to indicate that the mother was notified that her frequent incarceration was a deficiency that could be the basis for terminating her rights and reversed the termination order.  F.M.O., 194 Wn. App. at 232-33.

The facts are significantly different here.  The father's parental rights to L.G. and S.G. were not terminated because he was not accountable.  The basis for the dependency, the father's primary deficiency, and reason for terminating his parental rights was the severe abuse, characterized by expert witnesses as "torture," he inflicted on A.L., his seven-year-old step-child.  While several Department witnesses did testify about the father's lack of accountability or responsibility, those discussions cannot be removed from the context of the reason why the children were in the Department's custody.  The children were taken into protective custody because the parents presented a grave safety risk to the children.  And in contrast to the facts in A.M.M. and F.M.O., the father had ample notice of the Department's allegation that his abuse of A.L., in conjunction with his history of domestic violence, made him unfit to parent and that the

13

severe and prolonged physical abuse and mistreatment of A.L. would be the primary issue at trial.[6]

The July 2020 petition also notified the parents of the Department's view that their failure to recognize their conduct as abuse and take responsibility for the trauma and harm they caused was a barrier to the parents' ability to correct their deficiency. The petition alleged that "[s]ervice providers note the poor prognosis for the parents in this case and explain that there are no services that can address the parents' lack of recognition that their long term physical and emotional abuse of their child caused extraordinary trauma."

The petition further alleged that the Department's safety concerns were not alleviated, in large part, because the father failed to accept his culpability.

> [The father] refused any liability for the torture and assaults against [A.L.] that left visible physical marks in addition to psychological impacts. He failed to attend his scheduled psychological evaluation. To date his refusal to participate in services demonstrates a lack of understanding or acceptance of culpability. . . . [The father's] lengthy history of abuse . . . has in no way been mitigated during this dependency.

It is evident from the record that the father was, in fact, aware of the Department's position that acknowledging responsibility for the prior abuse was critical to correcting his parental deficiency. The father, who was the first witness

_____

[6] The father claims in reply that the "allegations of abuse in the petition pertained to [A.L.] and her mother, not [the father] and his children." To the extent the father contends that the basis for the dependency and petition to terminate his parental rights to L.G. and S.G. was not premised on the father's abuse of A.L., he is mistaken. It was undisputed that L.G. and S.G. were not subjected to the same physical abuse, but were in the home and aware of the abuse of their sister. And the termination petition alleged that the abuse of A.L was a part of the father's "lengthy history of abuse toward children and to their mothers" that put the younger two children at risk.

to testify at the fact-finding hearing, responded to the Department's concerns that he saw no need to change his behavior. For instance, the father talked about needing "some help" in certain areas to be a "better parent." The father admitted that his "situation" was attributable to his own behavior and that he needed to "be responsible for [his] actions" and "make things right." The father also testified about finding a better way to address conflict and frustration from the way he was "raised," and indicated that he was "not in denial" about the issues that led to the Department's intervention. When he was recalled to testify after the Department presented its case, the father insisted that he took "full accountability" for his conduct. The father's attorney reiterated this claim in closing remarks.

There was no violation of the father's right to due process. It was the father's conduct of inflicting severe physical abuse and mistreating his stepchild and inability to remedy that parental deficiency, not his failure to be accountable, that resulted in the termination of his parental rights. And the father was aware of the Department's view, shared by several providers and professionals involved in the case, that the father's failure to acknowledge the devastating consequences of his conduct was a strong indicator that had not remedied his deficiency.

Alternatively, to the extent he was apprised that the Department considered there to be a link between accountability and progress toward addressing his parental deficiency, the father challenges the court's finding that he failed to hold himself accountable. According to the father, the evidence shows that he expressed remorse, and took responsibility by pleading guilty to

15

criminal charges and actively engaging in all recommended services. We conclude the trial court did not err in finding otherwise.

While the father claimed to have taken responsibility for his actions, he also minimized his actions and blamed then seven-year-old A.L. for forcing him use violence. For instance, the father insisted that he only "whooped [A.L] with a belt" on one occasion, despite evidence of multiple severe beatings inflicted over a long period of time. And the father claimed that the beating was a necessary last resort because lesser punishments had been ineffective and A.L.'s misbehavior, which included stealing lunches from other children at school and cursing, was "really bad" and "all over the place."

The father also asserted his "innocence" to Dr. Shepel a year before the hearing and told a Department social worker that the Department's case was built on "lies." The father explained to Dr. Shepel that he only struck A.L. one time, and did so because A.L. was a "manipulator" who "provoked" him. The father told Dr. Shepel, that his conduct was consistent with the Bible, and was only perceived to be problematic because of regional and cultural differences. In view of the father's contradictory statements, the court was not required to accept at face value the father's testimony he accepted "full responsibility" for his abuse of A.L.

The father's guilty plea to criminal charges does not, in of itself, establish that he personally took responsibility for the abuse. There are a number of potential reasons to plead guilty, especially where, as here, charges are reduced in exchange for the plea. In this case, the father told Dr. Shepel that he accepted

legal liability in order to hasten his release from jail. The court was not required to infer that the father accepted personal responsibility simply because he pleaded guilty to charges.

Likewise, while the father asserted at trial that a "person who doesn't have remorse . . . wouldn't be doing services," this was not a necessary conclusion. And, largely as a result of his own choices, the father only began to engage in those services in February 2022, more than four years after his children were removed from the parents' care. Substantial evidence in the record supports the trial court's findings that the father failed to take responsibility for the abuse he inflicted on A.L. and failed to "substantially improve parental deficiencies" such that the children could be returned to his care in the near future. See RCW 13.34.180(e).

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____        _____
Feldman, J.                                Birk, J.